NEW HAMPSHIRE INSURANCE GUARANTY ASSOCIATION *vs.*
MARKEM CORPORATION & others.[1]

Suffolk. January 8, 1997. - March 4, 1997.

Present: WILKINS, C.J., O'CONNOR, GREANEY, FRIED, & MARSHALL, JJ.

*Comprehensive Environmental Response Compensation and Liability Act.
Jurisdiction,* Personal. *Insurance,* Insurer's obligation to defend. *Environ-
ment,* Environmental cleanup costs. *Governmental Immunity.*

The judge in a declaratory action correctly allowed the defendant's motion
to dismiss for lack of personal jurisdiction, where the plaintiff did not
establish that the defendant, a New Hampshire corporation, transacted
any business in the Commonwealth. [346-350]
The doctrine of sovereign immunity barred a declaratory action in State
court against the Federal Environmental Protection Agency and a
regional administrator, where the materials submitted did not establish
any transgression of legal authority as would support any claim that the
agency had acted ultra vires. [351-355]

CIVIL ACTION commenced in the Superior Court Depart-
ment on May 6, 1994.

The case was heard by *David M. Roseman,* J., on a motion
to dismiss.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Joseph C. Tanski* (*Mark Robins* with him) for the plaintiff.

*Robert C. Kirsch* (*Michael Bongiorno* with him) for Markem
Corporation.

*George B. Henderson,* Assistant United States Attorney, for
the United States Environmental Protection Agency & an-
other.

FRIED, J. The New Hampshire Insurance Guaranty As-
sociation (NHIGA), brought an action in the Superior Court
against Markem Corporation (Markem), the United States

[1]The United States Environmental Protection Agency and its regional
administrator.

Environmental Protection Agency (EPA), and the regional EPA administrator, seeking a declaration that it had no duty to defend or indemnify Markem for claims against Markem asserted by the EPA under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601 et seq. (1994), and that, if it did have such a duty, it would not be triggered until all claims against other potentially responsible parties (PRPs), with solvent insurers had been exhausted. The judge allowed Markem's motion to dismiss for lack of personal jurisdiction and dismissed the complaint against the EPA and its regional administrator on the ground of sovereign immunity. We transferred the case here on our own motion and now affirm.

## I

Markem is a New Hampshire corporation with its principal place of business in Keene, New Hampshire. Markem's main business is the manufacturing and sale of printing equipment and related products. Over a period of years, Markem had shipped spent solvents from its manufacturing process to a waste treatment and disposal company, Solvent Recovery Services of New England (SRS), in Connecticut. In 1992, the EPA notified Markem that it, among many others who used SRS's services, was a PRP within the meaning of CERCLA for hazardous wastes released at the Connecticut site. The EPA notification included a demand for reimbursement by Markem for a share of past and future costs incurred in cleaning up the Connecticut site.

During the relevant time period Markem was insured by American Mutual Insurance Company (American Mutual), and claims that that insurance would cover part or all of the sums it might be required to pay under CERCLA. In June, 1992, American Mutual, which had its headquarters in Wakefield, Massachusetts, was declared insolvent. See generally *Matter of the Liquidation of Am. Mut. Liab. Ins. Co.*, 417 Mass. 724 (1994). In New Hampshire, as in many States where American Mutual did business, a State insurance guaranty fund assumed part or all of the liabilities for claims against insolvent insurers "licensed to transact insurance in this state," N.H. Rev. Stat. Ann. § 404-B:5 (V)(a) (1983), by a claimant who is either a resident of New Hampshire at the time of the insured event or who is making a claim in respect

to property which is permanently located in New Hampshire. § 404-B:5 (IV). NHIGA is the guaranty entity created by the New Hampshire statute. Markem notified NHIGA of Markem's potential liability under the claims made by the EPA and requested NHIGA to notify it in respect to NHIGA's position regarding insurance coverage for that liability.[2] Markem also notified the permanent receiver of American Mutual and the New Hampshire Insurance Department of this potential liability. NHIGA eventually filed suit in the Superior Court seeking a declaration that for a variety of reasons, including noncoverage, failure to mitigate, and laches, it was not liable to defend or to pay on account of the EPA claims against Markem. NHIGA also sought a declaration that it was not liable for claims made by the EPA against Markem "unless and until other policies of insurance issued to other PRPs have been exhausted and that any amount payable by NHIGA shall be reduced by the amount of recovery under such other insurance." This last declaration was sought under the authority of the New Hampshire statute establishing NHIGA. N.H. Rev. Stat. Ann. § 404-B:12 (I). NHIGA argues that this provision not only protects the guaranty fund from claims by insureds of insolvent insurers who enjoy coverage under policies issued by solvent insurers but "also protect[s] a person insured under a policy issued by an insolvent insurer from claims asserted by persons who have not exhausted available coverage." Accordingly, NHIGA also sought a declaration against the EPA and its regional administrator "in his official capacity" to the effect that it either had no obligation to pay any EPA claims against Markem or that, in any event, any obligation was limited in this way.

## II

The reach of our courts is defined by G. L. c. 223A. As relevant here, § 3 states that a "court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action . . . arising from the person's (*a*) transacting any business in this commonwealth . . . [or] (*c*) caus-

---

[2]The letter of notification was addressed to NHIGA, in care of Guaranty Fund Management Services in Boston. Markem informs the court that NHIGA, like other State guaranty funds, had contracted Guaranty Fund Management Services to administer the fund.

ing tortious injury . . . in this commonwealth."[3] Personal jurisdiction is limited to causes of action arising out of the business the person sought to be reached transacts in the State and does not extend to all persons transacting any business at all in the State. *Tatro* v. *Manor Care, Inc.*, 416 Mass. 763, 767 (1994). *Good Hope Indus., Inc.* v. *Ryder Scott Co.*, 378 Mass. 1, 6 (1979). In this case, therefore, the proper exercise of jurisdiction over Markem turns on whether the cause of action brought by NHIGA arises out of business transacted by Markem here.

NHIGA acknowledges that it has the burden of proving the facts underlying the court's assertion of jurisdiction over Markem. *Droukas* v. *Divers Training Academy, Inc.*, 375 Mass. 149, 151 (1978). NHIGA complains, however, that the Superior Court judge wrongly failed to consider a voluminous submission (the appendix of exhibits) supporting the facts it argues make out its jurisdictional claim. The judge had stated in his order that,

> "The only affidavit submitted to the court by NHIGA was from [its attorney]. . . . [NHIGA's attorney's] affidavit contains no personal knowledge as to Markem's dealings with American. NHIGA has not provided any affidavits from individuals who would be able to testify from personal knowledge as to the business dealings between Markem and American. Nor has NHIGA submitted any affidavits supporting the documents that have been submitted to the court in the Appendix of Exhibits. Markem, on the other hand, submitted a series of affidavits from individuals with personal knowledge as to the business dealings of Markem, including those with American."

NHIGA complains that the judge misconceived the purpose of the affidavit, which was certainly not intended to supply the only material supporting its claim that the court had jurisdiction, and that no supporting affidavits were necessary to allow consideration of its many exhibits, since they consisted in part of documents and materials supplied by Markem itself

---

[3]We put to one side subsection (*c*), since the injury, if any, caused by Markem's conduct in shipping solvents to the disposal site in Connecticut occurred there and not here.

in response to the NHIGA's demands for jurisdictional discovery. We have examined these exhibits, which number in the hundreds. They consist, among other things, of invoices and vouchers showing that American Mutual did indeed send its bills from Massachusetts and that Markem's checks in payment were drawn on a Massachusetts bank; that proofs of claims were sent to American Mutual's permanent receiver in Massachusetts; that payments of claims under Markem's policies with American Mutual were drawn on Massachusetts banks and payable by and large to persons residing in New Hampshire; that certain persons covered by or making claims under Markem's policies with American Mutual had Massachusetts addresses; and that demands were made on Markem by companies in several States including Massachusetts that Markem provide insurance coverage in respect to work performed under contracts between Markem and those companies. These documents are accompanied by no explanation of their context or their relevance to the issue before the court. The accompanying affidavit of NHIGA's attorney, to which the judge makes reference, does no more than identify them as having been delivered by the appropriate persons in the offices of American Mutual's permanent receiver or of Markem. What the judge may very well be taken to have said is that these documents, without any further explanation by one having personal knowledge of their content and context, were insufficient to meet NHIGA's burden of proof. He need not be understood as saying that he was refusing to consider them at all for lack of proper authentication. If we are right about that, it is not surprising that, having been forced to wade through hundreds of pages of unexplained and unhelpful material, the judge denied without opinion NHIGA's motion for reconsideration asking him to go through it all again. But we admit that the words from the judge's order, *ante* at 347, might bear the interpretation that for lack of proper authentication he did not consider this material at all. Because this material is entirely documentary and to avoid any unnecessary prolongation of this dispute, we have examined this material ourselves and conclude that all it shows, at most, is that Markem did indeed send checks, forms, and correspondence for some of the many types of insurance it had with American Mutual to American Mutual's office in Massachusetts; that Markem received cor-

respondence from that office; and that it insured some wholly unspecified risks to persons and companies in Massachusetts.

To meet the requirements of § 3 (*a*) in this context, NHIGA must show that Markem either contracted for the policy in question in this State or that the activity the policy insured occurred here. Neither the documentary evidence discussed above nor the facts that American Mutual was headquartered in Wakefield and that Markem may have sent checks to Wakefield to pay for its policies; that the policies were assembled and mailed from there; or even that claims were directly or ultimately mailed to Wakefield and processed there, alter the conclusion that the contracts were concluded at American Mutual's New Hampshire office; that it had been American Mutual which was doing business in New Hampshire[4] ; and that it was to American Mutual's advantage to have it so appear. We conclude that these facts, as a matter of law, are not sufficient to warrant the assertion of personal jurisdiction under G. L. c. 223A, § 3 (*a*). American Mutual established its office in New Hampshire for the purpose of soliciting, negotiating, and concluding business with New Hampshire clients. That American Mutual then decided to conduct some administration of those policies in Massachusetts which caused Markem to have contact with Massachusetts cannot be the basis for personal jurisdiction against Markem where Markem reasonably assumed it would be doing business with American Mutual in New Hampshire and did in fact conduct most of its business with American Mutual there. See *Nichols Assoc., Inc.* v. *Starr*, 4 Mass. App. Ct. 91, 96 (1976) ("contact . . . limited to the defendant's acceptance of services which the plaintiff simply chose to perform in Massachusetts" as opposed to some other State

[4]In an interstate transaction, of course, the parties may often be said to transact business in both States. See *Good Hope Indus., Inc.* v. *Ryder Scott Co.*, 378 Mass. 1, 12 (1979). Where a business actively seeks to establish itself as doing business in another State and holds itself out as essentially a resident business of that State, however, a transaction with a resident of that State is essentially a local transaction from the perspective of the resident of that other State. The insurance context provides a good example of this. We have said that "only the barest of contacts with a State are required for jurisdiction over insurers" because insurers commonly seek out business across State lines, *"Automatic" Sprinkler Corp.* v. *Seneca Foods Corp.*, 361 Mass. 441 (1972). Those same contacts, however, with an out-of-State insurer would not subject the insured to jurisdiction in the home State of the insurer.

insufficient to meet requirements of § 3 [*a*]); *Morrill* v. *Tong*, 390 Mass. 120, 131 (1983) (child support payments and correspondence with children sent to Massachusetts insufficient under § 3 [*a*] because it was plaintiff that caused the contact with Massachusetts by moving here).[5] Potential buyers would be discouraged from dealing with our suppliers, if the kinds of contacts NHIGA relies on here were sufficient to allow such purchasers to be hauled by Massachusetts vendors into Massachusetts courts. See *Good Hope Indus.*, *supra* at 9 n.14 ("The attachment of jurisdiction over the defendant [in *Nichols Assoc., Inc.* v. *Starr*, 4 Mass. App. Ct. 93 (1976)] might well have implied that under § 3 [*a*] all *purchasers* could be rendered subject to long arm jurisdiction. So broad an interpretation would have promoted the unwanted result of discouraging foreign purchasers from dealing with resident sellers for fear of having to engage in litigation in distant courts" [emphasis in the original]). See also *Whittaker Corp.* v. *United Aircraft Corp.*, 482 F.2d 1079, 1085 (1st Cir. 1973). In this way, this case is quite different from cases where we have found jurisdiction because the defendant either actively solicited business from Massachusetts residents or knew it would deal directly with the plaintiff in Massachusetts. See *Tatro* v. *Manor Care, Inc.*, 416 Mass. 763, 765 (1994) (where the defendant hotel, "located very close to Disneyland . . . regularly solicits conference business from all over the country as a means of marketing its hotel rooms and other facilities"); *Good Hope Indus.*, *supra* at 4, 11-12 (defendant seller contracted to send final work product to Massachusetts and it "reasonably could have foreseen that significant managerial decisions, based on the information it provided, would be made in Massachusetts").[6]

---

[5]Although we rest our decision on our interpretation of G. L. c. 223A, § 3 (*a*), we note that the activities here, even if they fell within the literal meaning of transacting business in the Commonwealth, might not satisfy the due process requirement that the activities giving rise to the cause of action were "purposely directed" to the forum State. *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 472-476 (1985).

[6]We note that this is not a case where NHIGA engages in forum shopping looking for a more sympathetic court or jury, or just for "home cooking." Since recoveries by Markem and the EPA are likely to come from NHIGA and have an impact on rates charged New Hampshire insureds, there is no reason to believe that a Massachusetts forum — which is what

## III

NHIGA sought a declaratory judgment against the EPA and its regional administrator to establish not only that NHIGA was not obligated to defend against or pay any claims made by the EPA in respect to the SRS site, but also to establish that any obligation of NHIGA to pay such claims against Markem depended on the EPA's first exhausting all claims against other PRPs who are not insured by insolvent insurers.

This is a suit seeking a declaration as to how an agency of the Federal government should go about its business of enforcing an elaborate Federal statutory scheme. Common sense requires the conclusion that such supervisory adjudication does not belong in State court. Legal doctrine does as well.

Sovereign immunity is an ancient doctrine, which applies with full rigor today. *Sea-Land Serv., Inc.* v. *United States,* 919 F.2d 888, 889 (3d Cir. 1990), cert. denied, 500 U.S. 941 (1991) ("the English legal doctrine that the sovereign is immune from suit to which it has not consented has been applied by courts in this country as vigorously as it had been in England"). Whatever its original purpose, today it protects the public treasury against money judgments and public administration from interference by the courts at the behest of litigants except in instances and by procedures the Legislature has authorized. See Krent, Reconceptualizing Sovereign Immunity, 45 Vand. L. Rev. 1529 (1992). But it has always been a doctrine that seemed at least in tension with the rule of law and also with particular constitutional protections, such as the prohibition against takings for public use without the payment of compensation. See Fifth Amendment to the United States Constitution; art. 10 of the Declaration of Rights of the Massachusetts Constitution; *United*

---

NHIGA seeks — would be more sympathetic to NHIGA than a New Hampshire forum. Many of the guaranty funds from the several States concerned with American Mutual's insolvency have turned over the administration of their claims to an entity domiciled here. That entity may prefer the convenience of litigating all claims here rather than all over the country. But that is just why personal jurisdiction here would be undesirable: persons who dealt with American Mutual through agencies all over the country would have to litigate here. Though ex post an advantage to Massachusetts insurers, ex ante it would be a deterrent to doing business with them in the first place. *Good Hope Indus., Inc., supra* at 9 n.14.

*States* v. *Lee,* 106 U.S. 196, 218 (1882). Accordingly, a number of doctrines have been devised to mediate this tension. The most famous perhaps, seeking to subject State officers to the discipline of Federal law while respecting the sovereign immunity of the States declared in the Eleventh Amendment to the United States Constitution, allows prospective relief in Federal court against State officers in their personal capacity preventing them from violating Federal law. *Ex parte Young,* 209 U.S. 123 (1908). The doctrine on which NHIGA places reliance here is similar to that invoked in *Ex parte Young.* A Federal officer, even one acting in his official capacity, might be enjoined from acting if his threatened action was ultra vires, the theory being that the action would not be the act of the sovereign at all. The statement of this doctrine on which NHIGA places principal reliance was the dictum in *Larson* v. *Foreign & Dom. Commerce Corp.,* 337 U.S. 682, 689-90 (1949):

> "[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief. It is important to note that in such cases the relief can be granted, without impleading the sovereign, only because of the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient."

The meaning of this exception has been the subject of considerable perplexity and dispute, *Pennhurst State Sch. & Hosp.* v. *Halderman,* 465 U.S. 89, 116 (1984); Hart & Wechsler, Federal Courts, at 1017-1027 (4th ed. 1996), for it has been recognized that unless strictly limited this exception could swallow the rule. Almost any dispute with the sovereign can be turned into a claim that the sovereign's agents were in some respect not in compliance with law and thus acting ultra vires. As the Supreme Court explained in *Pennhurst State Sch. & Hosp., supra* at 101 n. 11, discussing the ultra vi-

res exception to sovereign immunity in the context of an Eleventh Amendment case:[7]

> "[*Larson, Florida Dep't of State* v. *Treasure Salvors, Inc.*, 458 U.S. 670 (1982)] and other modern cases make clear that a state officer may be said to act ultra vires only when he acts 'without any authority whatever.' *Treasure Salvors*, 458 U.S., at 697 (opinion of Stevens, J.); accord, *id.*, at 716 (White, J. concurring in part and dissenting in part) (test is whether there was no 'colorable basis for the exercise of authority by state officials'). As the Court in *Larson* explained, an ultra vires claim rests 'on the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient.' *Larson, supra,* at 690."

Moreover, it is recognized that as against Federal officers the need to recur to such obviously strained and indirect means in order to ensure their lawful behavior has been greatly attenuated by the passage of the Tucker Act, 28 U.S.C. §§ 1346 (a) (2), 1491 (a) (1) (1994), and the Federal Tort Claims Act, 28 U.S.C. § 1346 (b) (1994), providing a waiver of sovereign immunity and remedial scheme for certain money claims against the United States, and by the Administrative Procedure Act of 1976 which waived sovereign immunity, 5 U.S.C. § 702 (1994) ("An action in a court of the United States[8] seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed . . . on the ground that it is against the United States").

The theory by which NHIGA seeks to bring the EPA and its regional administrator before our courts is this: the New Hampshire Insurance Guaranty Association Act, N.H. Rev. Stat. Ann. § 404-B:12, which provides that:

---

[7]The analysis of the ultra vires exception to sovereign immunity under the Eleventh Amendment is identical to the analysis here. *Kozera* v. *Spirito*, 723 F.2d 1003, 1008 n.4 (1st Cir. 1983).

[8]Throughout the United States Code the phrase "court of the United States" designates a Federal court. When both State and Federal courts are meant the phrase that is used is "courts in the United States." See, e.g., 28 U.S.C. § 1607 (1994). See also *Aminoil U.S.A., Inc.* v. *California State Water Resources Control Bd.*, 674 F.2d 1233 (9th Cir. 1982) (Tucker Act waives sovereign immunity in Federal but not State courts).

"Any person having a claim against an insurer under any provision and an insurance policy other than a policy of an insolvent insurer which is also a covered claim . . . shall be required to exhaust first his right under such policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such insurance policy."

From this premise NHIGA goes on to argue that not only must Markem exhaust any coverage it might have in respect to the SRS site claim under policies issued by solvent insurers, but also that the EPA and its regional administrator, in seeking recovery in respect to the SRS site cleanup, are obligated to proceed first against other PRPs (i.e., others who on a statutory analogy to joint tortfeasors contributed to the pollution at the site) insured by solvent insurers before proceeding against Markem. On this argument the Guaranty Act would increase the pro rata liability of other PRPs because they had solvent insurers, even though Markem itself may not be insolvent. Thus this argument extends the strictures of § 404-B:12 (I) from the insured of the insolvent insurer to the injured party who may have claims both against that insured and other insureds with solvent insurers. The authority for this next step is sparse indeed. See *Broughton* v. *Manning Motor Express, Inc.*, 677 F. Supp. 531, 534 (S.D. Ohio 1987); Toms *vs.* Waters, Ohio Ct. App. No. E-92-19 (Mar. 31, 1993); *Witkowski* v. *Brown*, 576 A.2d 669, 671-672 (Del. Super. Ct. 1989). The next step in the argument is to extend it to impose an obligation on the EPA and its regional administrator as persons having claims against the insured of an insolvent insurer. Although ordinarily State law cannot impose obligations on Federal officers in respect to the conduct of their Federal duties, *McCulloch* v. *Maryland*, 17 U.S. (4 Wheat) 316 (1819); *Osborn* v. *Bank of the U.S.*, 22 U.S. (9 Wheat) 738 (1824), NHIGA argues that the Mc-Carran-Ferguson Act, which provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance," 15 U.S.C. § 1012 (b) (1994), subjects Federal officers to the strictures of the Guaranty Act because it is such a State law. As the final steps NHIGA argues that the EPA and its regional administrator, in

proceeding against Markem without first having exhausted their claims against other PRPs with solvent insurers, are violating the Guaranty Act, which by virtue of McCarran-Ferguson Act is binding on them, and that therefore their demand upon Markem exceeds their lawful authority and is ultra vires.

We intimate no conclusion on this argument nor on any of its several steps. We are quite clear, however, that this argument is far from demonstrating the kind of clear transgression of legal authority that may attract whatever is left of the ultra vires exception to sovereign immunity. See *Florida Dep't of State* v. *Treasure Salvors, Inc.*, 458 U.S. 670, 697 (1982) (ultra vires exception applies only when officer acts "without any authority whatever"); *Pennhurst State Sch. & Hosp.*, *supra* at 116 ("ultra vires doctrine [is] a narrow and questionable exception" to sovereign immunity). Cf. *Aminoil U.S.A., Inc.* v. *California State Water Resources Control Bd.*, 674 F.2d 1227, 1234 (9th Cir. 1982). We therefore hold that this action against the EPA and its regional administrator is barred by sovereign immunity.

*Judgment affirmed.*