Hinkle, J.
Plaintiff National Medical Care, Inc. and its related parties (collectively, “plaintiff’) bring claims against defendants Home Medical Care of America, Inc. (“HMA”), Homecare Concepts of America, Inc. (“HCA”), National Century Financial Enterprises, Inc. (“NCFE”), Kachina, Inc. (“Kachina”), Thor Capital Holdings, LLC (“Thor”), Chartwell Care Givers of New York, Inc. f/k/a Home Medical of New York, Inc. (“Chartwell”), Lance K. Poulsen and Craig W. Porter (“the individual defendants”). This matter is now before the court on the individual defendants’ motions to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.[3] A hearing on these motions was held on March 13, 2002. For the following reasons, Porter’s motion to dismiss is DENIED, and Poulsen’s motion to dismiss is ALLOWED.
BACKGROUND
Defendant Porter’s Contacts with Massachusetts
In 1998, plaintiff sold a portion of the assets of its subsidiary, NMC Homecare, Inc. (“Homecare”) to HMA. Porter, then HMA’s Chief Executive Officer, was the principal negotiator of the purchase on HMA’s behalf. Affidavit of Ronald Kuerbitz, dated February 14, 2002 (“Kuerbitz Aff.”) ¶¶3-4. Porter appeared in Massachusetts several times between April 1998 and the July 29, 1998 closing of the asset sale to negotiate the terms of the sale and to participate in due diligence. Id. ¶!¶3-9. While in Massachusetts, Porter met with Kuerbitz, who is NMC’s Senior Vice President and General Counsel. Id. ¶3. Kuerbitz was NMC’s Vice President of Corporate Development at the time of the sale.
During negotiations, Porter and Kuerbitz discussed, among other things, the status and treatment of accounts receivable and proceeds from Homecare’s interdialytic parenteral nutrition (“IDPN”) business, assets that were not being sold to HMA. Id. ¶9. Homecare chose to retain the IDPN business and its related receivables.
Because plaintiff and HMA recognized that payments for IDPN services could not easily be segregated from other payments to which HMA would be entitled, plaintiff granted HMA temporary access to monies from the bank accounts in which all payments, including IDPN payments, would be deposited. Id- According to the procedure established by HMA and NMC, HMA was to separate IDPN payments and return them to plaintiff within five business days of their receipt. HMA maintained that this procedure was necessary to secure its financing arrangement with NCFE.
Because the terms of HMA’s purchase of Homecare’s assets included $69 million in promissory notes, plaintiff “insisted on, and received, guarantees of HMA’s obligations from both HCCA and NCFE, and a pledge of a portion of Thor’s stock in HMA as security for the first promissory note.” Id. ¶10.
After the closing, Kuerbitz and Porter remained in contact, both by telephone and video conference. Id. ¶ 11-12. During this time, they discussed the status of the IDPN payments. Id. ¶ 11. In August or September 1998, Porter called Kuerbitz and requested a change in the parties’ agreement regarding the IDPN payments. Id. ¶13. Specifically, Porter requested that the IDPN payments be sent directly to NCFE and be remitted by NCFE to plaintiff. Plaintiff agreed to this change and, in a letter dated September 8, 1998, set forth a new procedure for handling the IDPN funds. Id. ¶ 14. This letter agreement was signed by Porter and mailed to plaintiff in Massachusetts. Under the new procedure, the bank would sweep all payments made to the bank account to NCFE, and NCFE would remit the IDPN payments to plaintiff within five days. Id.
On several occasions in December 1998 or January 1999, Porter called Kuerbitz and spoke to him about the IDPN payments. Id. ¶ 15. During these calls. Porter told Kuerbitz that Poulsen, Chief Executive Officer of NCFE, was refusing to return IDPN payments as required by the September 8 agreement. Id. During these calls, Porter acknowledged that HMA, NCFE, and Poulsen had no legitimate claim to the IDPN payments. Id. Therefore, Kuerbitz requested that the funds be returned to plaintiff. In May 2000, Porter attended a compliance meeting in Massachusetts where he, Kuerbitz and others discussed, among other things, the status of the IDPN funds. Id. ¶16. During this meeting, Porter acknowledged that the funds had been mistakenly withheld but stated that he was *542 working to resolve the issue. Deposition of Michael Sicilian, January 8, 2002, p. 308.
Plaintiff claims that HMA failed to remit all the IDPN funds and that Porter and Poulsen began to skim the funds without plaintiffs knowledge or consent. Plaintiff sued both individual defendants in their individual capacity, alleging conversion and violation of G.L.c. 93A, §11.
Defendant Poulsen's Contacts with Massachusetts
Poulsen, his partner Donald Ayers, and their wives, Barbara Poulsen and Rebecca Parrett, own all the stock of each corporate defendant, including HMA and HCA, of which Porter was Chief Executive Officer at all relevant times. Poulsen is Chief Executive Officer of NCFE. In July 1998, UMA bought a portion of Homecare’s assets. HMA was a company formed by HCA, NCFE and Thor Capital. NCFE financed the purchase. In May and July 1998, Poulsen sent correspondence to Massachusetts relating to the asset purchase, including a commitment by NCFE to fund the purchase and NCFE’s guarantee of HMA’s payment obligation. Poulsen Aff. ¶9. Poulsen also participated in telephone conversations with Porter during the negotiations in Massachusetts and sent agents to Massachusetts to perform due diligence. Kuerbitz Aff. ¶5.
DISCUSSION
In Massachusetts, personal jurisdiction over a nonresident defendant requires a two-step analysis: (i) whether jurisdiction exists under the longarm statute, G.L.c. 223A, §§3(a)-(g), and (ii) whether jurisdiction is constitutional under the due process clause. Morris v. Morris, 403 Mass. 1001, 1001 (1988); Good Hope Indus., Inc. v. Ryder Scott Co., 378 Mass. 1, 5-6 (1979). The plaintiff has the burden of establishing personal jurisdiction. Nicholas Assoc., Inc. v. Starr, 4 Mass.App.Ct. 91, 93, aff'd., 370 Mass. 866 (1976).
The Longarm Statute
The Massachusetts longarm statute lists the minimum contacts for a court to exercise personal jurisdiction over a non-resident defendant. G.L.c. 223, §3. At issue in this case is G.L.c. 223A, §3(a), which provides that “a court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person’s transacting any business in this commonwealth.”[4] The Appeals Court has stated that this subsection “is grounded on specific personal jurisdiction, that is, the defendant must have transacted business in Massachusetts, and the plaintiffs claim must have arisen from those forum-based contacts.” Connecticut Nat’l Bank v. Hoover Treated Wood Products, Inc., 37 Mass.App.Ct. 231, 233 n.6 (1994), citing Tatro v. Manor Care, Inc., 416 Mass. 763, 767 (1994).
Section (a) reaches “any purposeful act by an individual, whether personal, private or commercial.” Ross v. Ross, 371 Mass. 439, 441 (1976). Courts should construe the “transacting any business” language in §3(a) broadly. See Tatro, 416 Mass. at 768; Ross, 371 Mass. at 441. Whether a particular defendant’s acts constitute transacting any business must be decided on the particular facts of the case. Morrill v. Tong, 390 Mass. 120, 129 (1983); Droukas v. Divers Training Academy, Inc., 375 Mass. 149, 156-57 (1978). While jurisdiction over a corporation does not automatically confer jurisdiction over its officers, “active entrepreneurial or managerial conduct” in a State will cause jurisdiction to attach. Kleinerman v. Morse, 26 Mass.App.Ct. 819, 824 (1989) (citation omitted). See also Tufts Electronics Group, Inc. v. Alfarano, 1998 WL 1284182 (Gants, J.) (finding personal jurisdiction over individual officers of New York corporation, under G.L.c. 223A, §3(a), where individuals attended meetings in Massachusetts with plaintiff pertaining to defendant corporation’s satisfaction of its accounts payable to plaintiff and entered into memorandum of understanding to resolve dispute).
The “arising from” language in §3(a) is also to be broadly construed. Tatro, 416 Mass at 771. This requires the court to determine whether the plaintiffs claim arises out of a defendant’s Massachusetts business transactions. See, e.g., New Hampshire Ins. Guar. Ass’n v. Markem Corp., 424 Mass. 344, 347 (1997) (“(p)ersonal jurisdiction [under G.L.c. 223A, §3(a)] is limited to causes of action arising out of the business the person sought to be reached transacts in the State and does not extend to all persons transacting any business at all in the State”). In Tatro, the SJC held that the “arising from” clause “should be interpreted as creating a ‘but for’ test.’’[5] 416 Mass. at 770-71.
Porter argues that his actions do not subject him to jurisdiction in Massachusetts because he only acted in his corporate capacity in Massachusetts and any alleged conversion necessarily occurred outside Massachusetts. Poulsen, in turn, argues that plaintiff has failed to show that he transacted any business in Massachusetts other than in his corporate capacity and contends that he never appeared in Massachusetts in connection with the claims against him. Both defendants also argue that plaintiff fails to satisfy the due process requirements of personal jurisdiction.
Plaintiff argues that Porter’s status as a corporate officer does not prevent jurisdiction over him because he engaged in “direct personal participation.” Pl. Memo, in Opposition to Def. Porter’s Mot. to Dismiss (Pl. Memo #1) at 7. Plaintiff also argues that its claim against Porter for conversion arose from Porter’s transaction of business in Massachusetts. Specifically, plaintiff points to the fact that Porter, both in person and by telephone in Massachusetts, negotiated the exclusion of the IDPN assets from the Asset Purchase Agreement and established a lockbox system, arranged the process by which the parties would sweep the fund to HMA and HMA would return the *543 same to plaintiff and later changed that system so that the payments would be swept to NCFE, who would return them to plaintiff.
Plaintiff argues that Poulsen transacted business in Massachusetts in connection with the IDPN payments. Plaintiff also argues that Poulsen “caused” Porter to negotiate the agreement which gave HMA temporary access to plaintiffs IDPN assets and then “arranged through his agent, Porter,” to change the Agreement and grant NCFE temporaiy access to those assets. Pl. Memo in Opposition to Def. Poulsen’s Mot. to Dismiss (Pl. Memo #2) at 9. Plaintiff also claims that Poulsen “controlled the entire transaction and orchestrated the post-transaction IDPN conversion.” Id. at 11. Plaintiff contends that Poulsen’s alleged conversion of the IDPN payments arose from his transaction of business in Massachusetts, particularly since Poulsen insisted on a modification of the IDPN agreement which resulted in the funds being swept to NCFE.
The record before me shows that Porter’s contacts with Massachusetts during the relevant period were substantial and continuous. Porter negotiated the exclusion of the IDPN assets from the Asset Purchase Agreement in Massachusetts and ultimately signed that Agreement. He also established the IDPN lockbox system and later, by a telephone call to Kuerbitz in Massachusetts, negotiated a change in the system so that the payments would be swept to NCFE. Porter engaged in communication with Massachusetts citizens by telephone, videoconference and correspondence concerning the IDPN payments. He attended a meeting in Massachusetts and discussed, among other things, the status of the IDPN payments. In my view, these contacts are more than sufficient to show that Porter transacted business in Massachusetts within the meaning of §3(a).
Porter argues that “for jurisdictional purposes, the tort of conversion is said to have occurred where the defendant exercised dominion or control over the allegedly converted items, in this case, the IDPN funds.” Porter’s Reply Memo, at 5. Since the IDPN funds were never located, controlled in, or transferred to Massachusetts, but instead were at all relevant times located in lockbox accounts in Chicago, Porter (and Poulsen) argue that any claim for conversion necessarily must have arisen in Illinois.
In making his arguments, Porter ignores the difference in establishing jurisdiction of a conversion claim among G.L.c. 223A, §3(a) and §3(c) or (d). Because plaintiff asserts jurisdiction over Porter under §3(a), plaintiff has to show that the alleged conversion of IDPN funds by Porter would not have occurred but for his business transactions in Massachusetts. See Connecticut Nat’l Bank v. Hoover Treated Wood Products, Inc., 37 Mass.App.Ct., 231, 235 (1994) (where secured creditor of lumber company brought action against company’s out-of-state supplier for conversion of goods allegedly belonging to creditor, alleged conversion arose from supplier’s transaction of business v within Massachusetts even though converted lumber was physically located in Georgia).
Porter’s argument that this Court lacks jurisdiction over the conversion claim because the IDPN funds were physically located in Illinois becomes relevant only if plaintiff asserts jurisdiction under §3(c) or (d). See Princeton Capital Finance Co., LLC v. Marketechs, Inc., 10 Mass. L. Rptr. 157, 1999 WL 1318955 (Connolly, J.) (finding no personal jurisdiction under c. 223A, §3(d) because plaintiffs property was converted in Connecticut and any resulting injury would have also occurred there so plaintiff could not satisfy requirement of §3(d) that defendant cause tortious injury in Massachusetts). Here, plaintiff presents sufficient evidence to conclude that the claim for conversion and the related c. 93A claim arise from Porter’s meetings, telephone calls, correspondence, and other continuous and purposeful contacts with plaintiff in Massachusetts, all of which relate to the treatment of the IDPN payments.[6]
Poulsen’s contacts with Massachusetts are another matter. Poulsen’s only alleged Massachusetts contacts related to the conversion claim is a telephone call he participated in with Kuerbitz and Porter in connection with the IDPN payments and other post-closing issues and a meeting with Kuerbitz and Porter which included a discussion of treatment of the IDPN payments. See Deposition of Craig Porter, October 23, 2001, Tr. 161, 167. However, Porter’s testimony in his deposition on this issue contains no mention of Massachusetts or an approximate time frame as to when the conversation or meeting occurred. Therefore, that testimony does not support plaintiffs position.
Due Process
The constitutional due process requirement of minimum contacts in the forum state must also be satisfied. Tatro, 416 Mass. at 772-73; Good Hope, 378 Mass. at 7. At issue is “whether there was some minimum contact with the Commonwealth which resulted from an affirmative, intentional act of the defendant, such that it is fair and reasonable to require the defendant to come into the State to defend the action.” Conn. Nat’l Bank, 37 Mass.App.Ct. at 236, quoting Good Hope, 378 Mass at 7. Where the “defendant’s contacts with the forum were deliberate and not fortuitous, [such that the defendant could not reasonably foresee] ‘the possible need to invoke the benefits and protections of the forum’s laws,’ ” the plaintiff has met its burden. HTI Voice Solutions, Inc. v. Telephone Credit Union of New Hampshire, 2002 WL 287715 (Neel, J.), quoting Good Hope, 378 Mass. at 11.
As noted, Porter, on behalf of the defendants, negotiated and entered into a transaction with Massachusetts companies. He negotiated treatment of the IDPN assets and later re-negotiated this issue. He initiated *544 telephone calls to and participated in videoconferences in Massachusetts. At Porter’s request, plaintiff agreed to allow HMA to establish a videoconferencing facility linking Porter’s office in New Jersey to NMC’s headquarters in Massachusetts. Porter also visited Massachusetts on many occasions in connection with the overall transaction. The totality of this conduct satisfies due process.
ORDER
For the foregoing reasons, the motion to dismiss for lack of personal jurisdiction is DENIED as to Craig W. Porter and ALLOWED as to Lance K. Poulsen.

 Poulsen filed a single motion to dismiss for lack of personal jurisdiction and for failure to state a claim. NCFE, HMA and Porter also filed 12(b)(6) motions. A hearing on those motions is scheduled for April 29, 2002.

 In its complaint, plaintiff asserted jurisdiction under c. 223A, §3(a), (c) and (d). However, in its oppositions to the individual defendants’ motions to dismiss, plaintiff only asserts jurisdiction under §3(a).

 In adopting the “but for” test, the SJC rejected the First Circuit’s analysis in Marino v. Hyatt Corp., 793 F.2d 427, 428 (1st Cir. 1986), and Pizarro v. Hoteles Concorde Intl., C.A., 907 F.2d 1256, 1259 (1st Cir. 1990), which requires that the business transacted be the legal or proximate cause of the plaintiffs injuries. Instead, the SJC follows the less restrictive approach of Lanier v. American Bd. of Endodontics, 843 F.2d 901, 909 (6th Cir.), cert. denied, 488 U.S. 926 (1988); Shute v. Carnival Cruise Lines, 897 F.2d 377, 383-86 (9th Cir. 1990); and Prejean v. Sonatrach, Inc., 652 F.2d 1260, 1270 n. 21 (5th Cir. 1981). Specifically, “a claim arises from a defendant’s transaction of business in the forum State if the claim was made possible by, or lies in the wake of, the transaction of business in the forum State.” Tatro, 416 Mass. at 771.

 Porter argues that the alleged unfair and deceptive acts forming the basis of the Chapter 93A claim did not occur in Massachusetts. I reserve resolution of this issue for the Rule 12(b)(6) hearing.