Richard A. DAYNARD, Plaintiff,

v.

NESS, MOTLEY, LOADHOLT, RICH-
ARDSON & POOLE, P.A.; Ronald
Motley; Scruggs, Milette, Bozeman &
Dent, P.A.; and Richard F. Scruggs,
Defendants.

No. CIV.A.01–10099–WGY.

United States District Court,
D. Massachusetts.

Dec. 21, 2001.

Edward J. Barshak, Sugarman, Rogers, Barshak & Cohen, Boston, MA, for Plaintiff.

Michael E. Mone, Esdaile, Barrett & Esdaile, Boston, MA, Mark A. Pogue, Edwards & Angell, LLP, Providence, RI, Stephen M. Prignano, Edwards & Angell, LLP, Providence, RI, for Defendants.

## MEMORANDUM

YOUNG, Chief Judge.

The plaintiff, a local law professor, brought suit against two sets of defendants, one from Mississippi and the other from South Carolina. The suit has occasioned three hearings before the Court. At the first hearing, the Court held that the plaintiff failed to show why the Mississippi defendants should be subject to personal jurisdiction in Massachusetts. The Court did, however, allow the plaintiff jurisdictional discovery, which led to a second hearing on the matter of personal jurisdiction. At that hearing, the Court dismissed the Mississippi defendants for lack of personal jurisdiction and soon after entered partial judgment in their favor, thus permitting the plaintiff to appeal the ruling immediately. At the third hearing, the Court heard from the South Carolina defendants, who argued that without the Mississippi defendants the case either should be (i) dismissed for failure to join an indispensable party or (ii) transferred to Mississippi. The Court rejected both arguments. This memorandum explains these rulings.

## I. INTRODUCTION

As recounted by this Court in an earlier memorandum:

The plaintiff, Professor Richard A. Daynard ("Daynard") of Northeastern University School of Law, has spent much of his academic career studying how to defeat the tobacco industry in court. Compl. ¶¶ 21–29. The defendants—the Ness law firm and one of its partners, Mr. Motley (together "the South Carolina defendants"), and the Scruggs law firm and one of its partners, Mr. Scruggs (together "the Mississippi defendants")—were among the many law firms representing state governments in the titanic battle against the tobacco industry ("the State Tobacco Litigation"). Id. ¶¶ 15–19.

Between 1993 and 1997, Daynard provided advice to the defendants. Daynard Aff. ¶¶ 1–2. No written contract detailed how Daynard would be compensated, but Daynard alleges that he and one of the Mississippi defendants shook hands in Chicago, Illinois in 1996 on an agreement whereby he would receive 5% of any attorneys' fees paid to the defendants as a result of the State Tobacco Litigation. Id. ¶ 4. In 1997 and 1998, the tobacco industry agreed to settle the State Tobacco Litigation for billions of dollars. Since then, the defendants have received millions of dollars in attorneys' fees and Daynard has received nothing. Answer ¶¶ 65–66.

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 178 F.Supp.2d 9, 10 (2001).

Daynard filed a complaint in state court, which the defendants properly removed to this Court. 28 U.S.C. §§ 1332(a)(1), 1441(a). The South Carolina defendants consented to personal jurisdiction and answered the complaint. The Mississippi defendants, on the other hand, contested personal jurisdiction and did not answer the complaint, Fed.R.Civ.P. 12(b)(2), which led to the first hearing in this case.

## II. MISSISSIPPI DEFENDANTS

### A. Personal Jurisdiction

The first hearing took place on May 31, 2001. At that hearing, Daynard argued that the Court had personal jurisdiction over the Mississippi defendants by virtue

of *their* contacts with Massachusetts. The following discussion—like all the subsequent discussions in this memorandum—is written from the Court's perspective at the time of the hearing in question, in this instance May 31, 2001.

## 1. Procedural Posture

█ Under Rule 12(b)(2), the Court may employ a range of procedures to resolve questions of personal jurisdiction. *Foster–Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d 138, 145–47 (1st Cir.1995) (delineating separate "prima facie," "preponderance of the evidence," and "likelihood" standards). The "prima facie" standard is the "most conventional." *Id.* at 145. Accordingly, absent any reason to refrain from so doing, the Court will employ it. Under the prima facie standard, Daynard ultimately bears the burden of persuading the Court that personal jurisdiction exists over the Mississippi defendants, but at this preliminary stage of the case, before any disputed jurisdictional facts have been resolved, Daynard need only make a prima facie showing of personal jurisdiction. *See, e.g., Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 33–34 (1st Cir.1998). Accordingly, the Court will take the specific facts affirmatively alleged by Daynard as true (whether or not disputed) and construe them in the light most favorable to the jurisdictional claim. Next the Court will "add to the mix" those facts put forward by the Mississippi defendants "to the extent that they are uncontradicted." *Id.* at 34. Given this universe of facts, the Court will decide whether Daynard makes a prima facie showing of personal jurisdiction over the Mississippi defendants.

## 2. Facts

The Mississippi defendants present undisputed facts that they did not represent Massachusetts in the State Tobacco Litigation, they have no partners, employees, or property in Massachusetts, they never met with Daynard in Massachusetts, and their overall contact with Massachusetts in general and Daynard in particular was minimal or nonexistent. Defs.' Facts ¶¶ 7–12 [Docket No. 12].

Daynard paints a more complex picture.[1] He first got involved with the defendants in 1993, when the South Carolina defendants traveled to Massachusetts to seek his specialized knowledge in tobacco litigation. Daynard Aff. ¶ 1 [Docket No. 17]. As a result of that meeting, and many other meetings with the defendants that took place outside of Massachusetts, Daynard regularly communicated with both the South Carolina and the Mississippi defendants. *Id.* ¶ 2; Compl. ¶¶ 33–35. Daynard provided the defendants with extensive documentation that he had compiled over the years, introduced the defendants to experienced tobacco litigators and interested state government officials, and generally provided advice. Daynard Aff. ¶ 2; Compl. ¶¶ 36–38. Daynard performed most of these tasks from his office in Massachusetts.

After the State Tobacco Litigation began in 1994, Daynard was appointed counsel-of-record for several states, including Florida, Maryland, and Massachusetts, and worked with the defendants on issues relating to litigation in Florida and Mississippi. Compl. ¶ 41. To help the defendants, Daynard incurred communication and travel expenses, as well as payments to Northeastern University to reduce his

---

1. The facts recited in this section are consistent with, but do not draw upon, the affidavit Daynard filed in preparation for the *second* hearing on personal jurisdiction. *See* Daynard Aff. ¶¶ 1, 3–7, 10, 12, 16, 21, 26–28 [Docket No. 50].

teaching obligations. Daynard Aff. ¶ 2; Compl. ¶ 49.

Daynard and the defendants were in Chicago, Illinois for the Democratic National Convention around August 25, 1996. Compl. ¶ 55. Daynard was advised that the defendants wanted to meet with him to discuss his share of any fee awards. The South Carolina defendants apparently were unable to meet with Daynard as only the Mississippi defendants showed up. *Id.* ¶ 56. At the meeting, Mr. Scruggs and Daynard orally agreed that Daynard would receive 5% of any fees recovered in the State Tobacco Litigation. Daynard Aff. ¶ 4; Compl. ¶¶ 57–58. As a result of this agreement, Daynard continued to provide advice to the defendants and continued to incur expenses. Daynard Aff. ¶ 4; Compl. ¶ 60.

Following the tentative settlement of the Mississippi litigation, Daynard wrote to the Mississippi defendants in July 1997 to confirm the oral agreement reached the previous year. The Mississippi defendants never responded to the letter. Compl. ¶ 61. Following the tentative settlement of the Florida litigation, Daynard wrote to both the South Carolina and the Mississippi defendants in October 1997 to confirm the oral agreement reached the previous year. *Id.* ¶ 62. On November 7, 1997, the South Carolina defendants disavowed the oral agreement; on November 20, 1997, the Mississippi defendants did the same. *Id.* ¶ 63.

Daynard has never received any compensation from the Mississippi defendants. *Id.* ¶ 40.

### 3. Discussion

■ Personal jurisdiction over a distant defendant in a diversity action may be obtained by consent, *e.g., Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 584, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999), or

proper service of process as allowed by the forum state's long-arm statute, Fed. R.Civ.P. 4(k)(1)(A). The South Carolina defendants have consented to personal jurisdiction but the Mississippi defendants have not. Accordingly, the Court cannot assert personal jurisdiction over the Mississippi defendants until Daynard demonstrates that the Mississippi defendants lie within the reach of the Massachusetts long-arm statute as cabined by the Due Process Clause of the Fourteenth Amendment. *E.g., Lyle Richards Int'l, Ltd. v. Ashworth, Inc.,* 132 F.3d 111, 112 (1st Cir. 1997).

■ Before turning to the law, a few observations about the facts ought be highlighted. Daynard alleges that *he* communicated with the Mississippi defendants while *he* was in Massachusetts, but he is less clear with respect to how the *Mississippi defendants* made contact with Massachusetts; the communications into Massachusetts, according to Daynard, were from the South Carolina defendants. Although Massachusetts courts construe their long-arm statute broadly, neither the long-arm statute nor Due Process allows the unilateral actions of the *plaintiff* to confer jurisdiction. The focus is on the actions of the defendant, and in this case the facts portray the Mississippi defendants as the passive recipients of information, no different than a person in Mississippi watching the Boston Red Sox on television. The Mississippi defendants admit being present in Massachusetts on a few occasions, but never in connection with Daynard. Otherwise the Mississippi defendants present undisputed facts that they have no partners, employees, or property in Massachusetts and they never paid Daynard. Furthermore, none of Daynard's communications with the Mississippi defendants concerned the tobacco litigation in Massachusetts; Daynard's

complaint explicitly disclaims any fees as a result of the Massachusetts litigation. Compl. at 16 n. 1. In short, Daynard simply does not assert many facts showing how the Mississippi defendants made contact with Massachusetts.

If this Court were to assert personal jurisdiction over the Mississippi defendants based on their contacts, it would have to do so on a theory akin to unjust enrichment: the Mississippi defendants knew Daynard was working for them in Massachusetts, they accepted his work product, and they encouraged him to continue working there, but when it came time to pay Daynard, they disavowed any contacts with him or Massachusetts. Unfortunately for Daynard, this approach to personal jurisdiction contravenes conventional wisdom:

Where the client made no physical entry into the forum state, the fact that the professional physically performed the services in the forum state usually has not been sufficient contact to support long-arm jurisdiction over the client, unless the transaction was initiated by the defendant or the parties had engaged in similar transactions in the past.

2 Robert C. Casad & William B. Richman, *Jurisdiction in Civil Actions* § 8–11[1][a], at 217–19 (3d ed.1998) (footnotes omitted).

■ The following discussion takes the ideas above and tests them against the law of personal jurisdiction, especially the law as recently stated in the plethora of pellucid opinions by the First Circuit. The discussion proceeds in the traditional two-step fashion, first by examining whether the Massachusetts long-arm statute grants the Court jurisdiction to haul the Mississippi defendants into the forum, and second by examining whether it would be constitutional to exercise that jurisdiction.

### a. Massachusetts Long–Arm Statute

■ The Massachusetts long-arm statute provides, in relevant part:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's

(a) transacting any business in this commonwealth;

(b) contracting to supply services or things in this commonwealth;

(c) causing tortious injury by an act or omission in this commonwealth;

(d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth[.]

Mass. Gen. Laws ch. 223A, § 3; *accord* Unif. Interstate & Int'l Procedure Act § 1.03, 13 U.L.A. 355, 361–62 (1986). The long-arm statute recognizes two types of jurisdiction: specific and general. Subsections (a), (b), and (c) are forms of specific jurisdiction, in which the cause of action arises out of the defendant's activity in the forum. Subsection (d), in contrast, is a form of general jurisdiction, in which the cause of action does not concern the defendant's activity in the forum, but jurisdiction nevertheless is proper because of the defendant's "persistent course of conduct" or "substantial revenue from goods" in the forum. *See Conn. Nat'l Bank v. Hoover Treated Wood Prods., Inc.*, 37 Mass.App. Ct. 231, 233 n. 6, 638 N.E.2d 942 (1994); *see also Noonan v. Winston Co.*, 135 F.3d 85, 92–94 (1st Cir.1998) (considering general jurisdiction under subsection (d)). In his complaint, Daynard asserts jurisdiction over all the defendants under subsections (a), (c), and (d), Compl. ¶ 12, but with

respect to the Mississippi defendants, both parties correctly focus their attention only on subsection (a), the "transacting any business" prong of specific jurisdiction.

■ The long-arm statute requires that the cause of action "arise from" a specific transaction of business in the forum. Massachusetts employs a very broad "but for" test which is easily met. *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 770–71, 625 N.E.2d 549 (1994). In this case, the alleged breach of contract would not have happened "but for" the antecedent business transactions between the defendants and Daynard in Massachusetts.

■ The phrase "transacting any business in this commonwealth" has also been construed broadly. "[G]enerally the purposeful and successful solicitation of business from residents of the Commonwealth, by a defendant or its agent, will suffice to satisfy this requirement." *Id.* at 767, 625 N.E.2d 549. In *Tatro,* the Supreme Judicial Court held that a single telephone call from a hotel to a Massachusetts resident was sufficient to meet the "transacting any business" test because the call was part of a broader effort to generate business from Massachusetts residents. *Id.* at 768–69, 625 N.E.2d 549. In this case, the South Carolina defendants were the ones who formed the initial relationship with Daynard, but Daynard alleges that he had telephone conversations with the Mississippi defendants throughout the relationship, which conceivably could suffice as transacting business in Massachusetts. *Compare Good Hope Indus., Inc. v. Ryder Scott Co.,* 378 Mass. 1, 6–7, 389 N.E.2d 76 (1979) (defining "transacting any business" to include defendants's regular communications to buyer in Massachusetts), *with Lyle Richards,* 132 F.3d at 113 (rejecting jurisdiction where agreement was to be performed outside Massachusetts and plaintiff had initiated transac-

tion), *and N.H. Ins. Guar. Ass'n v. Markem Corp.,* 424 Mass. 344, 348–50, 676 N.E.2d 809 (1997) (rejecting jurisdiction over defendants buying from, as opposed to selling to, Massachusetts). As this Court recently stated, "contrary to [the defendant's] contention, section 3(a) does not require that the business be transacted within the physical bounds of Massachusetts. The fact that '[the defendant] never set foot in Massachusetts in connection with the proposed transaction' does not prevent the Court from exercising jurisdiction over [the defendant]." *JMTR Enters., LLC v. Duchin,* 42 F.Supp.2d 87, 96 (D.Mass.1999) (citations omitted).

■ The Court need not dwell on what constitutes "transacting any business," however, because "the Massachusetts long-arm statute functions as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States." *Tatro,* 416 Mass. at 771, 625 N.E.2d 549 (internal quotation marks omitted) (quoting, inter alia, *Good Hope Indus.,* 378 Mass. at 6, 389 N.E.2d 76). "It behooves us, therefore, to truncate our statutory analysis and enter the constitutional copse." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1087 (1st Cir.1992) [hereinafter *163 Pleasant St. I* ], *appeal after remand,* 987 F.2d 39 (1st Cir.1993) [hereinafter *163 Pleasant St. II* ].

### b. Due Process

■ "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Over time, this

"elastic standard[ ]," *id.* at 325, 66 S.Ct. 154 (Black, J., concurring in judgment), has been recast as a tripartite analysis: *First,* Daynard's claim must directly arise out of, or relate to, the Mississippi defendants' contacts with Massachusetts. *Second,* the Mississippi defendants' contacts with Massachusetts must represent a purposeful availment of the privilege of conducting activities in Massachusetts, thereby invoking the benefits and protections of Massachusetts' laws and making the Mississippi defendants' involuntary presence before Massachusetts courts foreseeable. *Third,* the exercise of jurisdiction must be reasonable, taking into consideration factors such as (i) the Mississippi defendants' burden of appearing, (ii) Massachusetts' interest in adjudicating the dispute, (iii) Daynard's interest in obtaining convenient and effective relief, (iv) the judicial system's interest in obtaining the most effective resolution of the controversy, and (v) the common interests of all sovereigns in promoting substantive social policies. *See, e.g., Phillips Exeter Acad. v. Howard Phillips Fund, Inc.,* 196 F.3d 284, 288 (1st Cir.1999); *Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 712–13, 717 (1st Cir.1996); *Sawtelle v. Farrell,* 70 F.3d 1381, 1389, 1394 (1st Cir.1995); *163 Pleasant St. I,* 960 F.2d at 1089 (introducing tripartite analysis). *See generally* 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1069, at 33–74 (3d ed.2002).

 The Supreme Court twice has considered the modern notion of personal jurisdiction in the context of a contract dispute. In the first case, *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), the Supreme Court allowed California to assert personal jurisdiction over an insurance company that had no contact with California except for a *single* insurance contract with the plaintiff, who had moved to California before dying. In the second case, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Supreme Court explained how a contract can form the basis for personal jurisdiction:

> The Court long ago rejected the notion that personal jurisdiction might turn on "mechanical" tests, or on "conceptualistic ... theories of the place of contracting or of performance." Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Id.* at 478–79, 105 S.Ct. 2174 (citations omitted).

With these thoughts in mind, the Court turns to the first prong of the tripartite analysis.

#### (1) Relatedness or "Arising out of"

 "We have approached the relatedness inquiry with slightly different emphases when the plaintiff asserts a contract claim [than] when [he] asserts a tort claim: if a contract claim, our stereotypical inquiry tends to ask whether the defendant's forum-based activities are 'instrumental in the formation of the contract' ...." *Mass. Sch. of Law,* 142 F.3d at 35. If a tort claim, the inquiry focuses on causation. Unlike the Massachusetts long-arm statute, which uses a broad "but for" test to determine relatedness, *see supra* p.

64, Due Process uses a more focused test closer to "proximate cause," *see Nowak,* 94 F.3d at 713–16. In particular, the First Circuit looks for a "nexus," which is described as "a small overlay of 'but for' on 'proximate cause.' " *Id.* at 715–16.

The First Circuit examined the question of relatedness in *Phillips Exeter.* In that case, Phillips Exeter Academy brought suit in its home state of New Hampshire against a trust fund in Florida that allegedly was not paying enough money. After the fund was established in Florida by a devoted alumnus of Phillips Exeter Academy, the fund routinely sent checks to New Hampshire and occasionally visited the school. The First Circuit held that New Hampshire did not have personal jurisdiction over the Florida defendant, however, because the formation of the underlying trust and all the important decisions with respect to how the trust would be operated were made in Florida without any interaction with New Hampshire. 196 F.3d at 290–91. The First Circuit also rejected the argument that the forum contacts were "related" to the cause of action simply because the *consequences* of the alleged breach of contract were felt in New Hampshire. Although the First Circuit recognized that the location where payments are due is relevant to the jurisdictional calculus, the First Circuit was unwilling to say that the defendant's payments to New Hampshire were "related" to the breach of contract. *Id.* at 291. In short, the contract was negotiated and "set in motion" in Florida, well before any contacts with New Hampshire, so the First Circuit held that the breach of contract "arose" out of Florida, not New Hampshire.

*Phillips Exeter* reflects the First Circuit's keen interest in whether "the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." *Id.* at 289

(citing, inter alia, *163 Pleasant St. I,* 960 F.2d at 1089–90). In the case at bar, the initial agreement indeed was formed in Massachusetts in 1993. Although it was the South Carolina defendants, not the Mississippi defendants, who initially formed the agreement, the Mississippi defendants' absence need not be fatal. For one, the South Carolina defendants arguably acted as the Mississippi defendants' emissary. In the words of *Burger King,* the "contemplated future consequence" of the 1993 meeting and the "actual course of dealing" over time was a close working relationship between Daynard in Massachusetts and the defendants in South Carolina and Mississippi. Furthermore, when the Mississippi defendants met with Daynard in Chicago, Illinois, the "contemplated future consequence" again was a course of dealing with Daynard in Massachusetts.

In contrast to *Phillips Exeter,* which turned on a single, out-of-forum transaction that determined the contract, the breach of contract in this case "arose" from a course of dealing between the parties. The contract was in the form of a working relationship—started in Massachusetts—that called for interaction between Massachusetts, South Carolina, and Mississippi. Drawing all inferences in favor of Daynard, he arguably meets the relatedness requirement.

### (2) Purposeful Availment

 The second prong of the tripartite analysis is "purposeful availment." "In order to be subject to Massachusetts' jurisdiction, a defendant need only have one contact with the forum state, so long as that contact is meaningful." *Nowak,* 94 F.3d at 717 (citing *McGee* and *Burger King* ). That being said, "the cornerstones upon which the concept of purposeful availment rest are voluntariness and foreseeability." *Sawtelle,* 70 F.3d at 1391.

*Sawtelle* explains why Daynard cannot show purposeful availment. The case involved a set of facts reminiscent of those presently before the Court: A resident of New Hampshire retained a law firm in Virginia to file a lawsuit in Florida. The Virginia law firm hired local counsel in Florida and together the law firms settled the lawsuit on behalf of their client, the New Hampshire resident. Later on, the New Hampshire resident sued the two law firms in his home state for malpractice. The First Circuit held that New Hampshire did not have personal jurisdiction over the Virginia and Florida defendants because the defendants had not purposefully availed themselves of the privilege of conducting business in New Hampshire:

> In the case at bar ..., the contacts of the defendants with New Hampshire were limited, consisting primarily of written and telephone communications with the clients in the state where they happened to live.
>
> The mere existence of an attorney-client relationship, unaccompanied by other sufficient contacts with the forum, does not confer personal jurisdiction over the non-resident in the forum state; more is required [citing *Burger King* ]. In this case, the defendant-attorneys' only connection with New Hampshire was the [plaintiffs'] residence there.

*Id.* at 1391–92 (citations omitted). The First Circuit went on to address the foreseeability prong of the purposeful availment test and held that nothing in the attorney-client relationship could have alerted the defendants that they might be haled into a New Hampshire court as a result of their representation of the New Hampshire resident. *Id.* at 1393.

The court in *Phillips Exeter* reiterated the teaching of *Sawtelle*. The First Circuit held that the Florida trust fund never reached out to New Hampshire to *create* a relationship, and the trust fund did not benefit in any way from the protections of New Hampshire law when it sent money to New Hampshire, so the trust fund's contacts were not voluntary and personal jurisdiction was not foreseeable. 196 F.3d at 292.

The case at bar cannot be distinguished from *Sawtelle*. Although Daynard formed a relationship with the Mississippi defendants, the relationship did not require the Mississippi defendants to do anything in Massachusetts. The Mississippi defendants might have sent communications to Massachusetts, but the only reason they did so was because Daynard happened to be living there at the time. In other words, nothing the Mississippi defendants did depended on their connection to *Massachusetts*; as in *Sawtelle*, "the defendant-attorneys' only connection with [Massachusetts] was the [plaintiff's] residence there." 70 F.3d at 1392.

*Burger King* does not dictate a contrary result. In that case, the defendant opened a Burger King franchise in Michigan after negotiating a twenty-year contract with Burger King's corporate headquarters in Florida. The Supreme Court upheld Florida's assertion of personal jurisdiction over the defendant because the defendant *voluntarily* accepted "the long-term and exacting regulation of his business from Burger King's Miami headquarters." 471 U.S. at 480, 105 S.Ct. 2174. Furthermore, personal jurisdiction in Florida was *foreseeable* because the defendant signed a franchise agreement that specified that Florida law would govern. *Id.* at 482, 105 S.Ct. 2174. In the case at bar, by way of contrast, the Mississippi defendants never submitted to any rules, regulations, or directions emanating from Massachusetts and never agreed to be bound by Massachusetts law.

Daynard cannot meet the purposeful availment requirement. Normally this would end the tripartite analysis because the Court need only consider "reasonableness," as informed by the "gestalt" factors, if Daynard can show *both* relatedness and purposeful availment. *Sawtelle,* 70 F.3d at 1394. Nevertheless, the Court will assume that Daynard can show *just enough* purposeful availment to reach the gestalt factors. There can be little harm in doing so because the reasonableness stage of the jurisdictional calculus evokes a sliding scale: the weaker Daynard's showing on the first two prongs (relatedness and purposeful availment), the less the Mississippi defendants need to show in terms of unreasonableness to defeat jurisdiction, and vice versa. *Id.* Accordingly, "[w]e proceed to consider the gestalt factors, bearing in mind the flimsy showings of relatedness and purposeful availment made by [Daynard] in this case." *Id.*

### (3) Reasonableness: the Gestalt Factors

■ The third prong of the tripartite analysis looks to five gestalt factors. The following discussion considers them in turn.

*1. The Mississippi defendants' burden of appearance:* This factor favors jurisdiction. "When, as here, a law firm regularly represents clients outside its home state, we conclude that the burden is neither special nor unusual." *Sawtelle,* 70 F.3d at 1395. *But cf. Ticketmaster–N.Y., Inc. v. Alioto,* 26 F.3d 201, 212 (1st Cir.1994) (concluding that burden on California resident was so onerous that it would be unreasonable to assert jurisdiction on basis of single defamatory remark in telephone call to Massachusetts).

*2. Massachusetts' adjudicatory interest:* This factor does not favor jurisdiction. In a tort case, the forum has an interest in enforcing its public policy to protect its domiciliaries, but in a contract case like this one, where the law of the forum likely will not govern, the forum has only a generalized interest in providing a convenient courthouse in which to resolve disputes.

*3. Daynard's interest in obtaining convenient relief:* This factor favors jurisdiction. "[A] plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience. Here, unquestionably, it would be more convenient for [Daynard] to litigate [his] claim in [his] home state rather than elsewhere." *Sawtelle,* 70 F.3d at 1395 (citations omitted).

*4. The efficient administration of justice:* This factor is a wash. On the one hand, asserting jurisdiction would prevent piecemeal litigation, but on the other hand, there is no indication that any witnesses or evidence will come from this state, other than Daynard himself. *Nowak,* 94 F.3d at 718.

*5. Pertinent policy arguments:* This factor favors jurisdiction. "Here, the most prominent policy implicated is the ability of a state to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors." *Sawtelle,* 70 F.3d at 1395.

The ultimate question to be answered, of course, is whether maintenance of the suit would offend "traditional notions of fair play and substantial justice." *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154. It would. Given that Daynard makes a weak showing of minimum contacts, the mixed gestalt factors are not enough to support personal jurisdiction over the Mississippi defendants.

### B. Joint Venture Theory of Personal Jurisdiction

The hearing on May 31, 2001 did not end favorably for Daynard but he had another

card up his sleeve: "attribution [sic] to the Scruggs firm of the conduct of their joint venturer here." Hr'g Tr. at 3 [Docket No. 30]. In other words, Daynard argued that the Mississippi defendants were in a joint venture with the South Carolina defendants and thus the minimum contacts of one could be attributed to the other. The Court's curiosity was sufficiently piqued that it granted jurisdictional discovery on the matter, received additional briefing, and scheduled another hearing. That hearing took place on September 13, 2001.

### 1. Facts

In his original complaint, Daynard hinted at the idea that the defendants were in a joint venture: "[Mr.] Scruggs acted with express, implied, or apparent authority to represent each of the defendants with regard to both the subject of the meeting [in Chicago, Illinois] and the specific discussions which took place at the meeting." Compl. ¶ 58. Daynard built on this theme in his first affidavit, but it was not until the Court ordered jurisdictional discovery that Daynard was able to unearth direct evidence of a joint venture. Here is what he found.

#### a. Mississippi Joint Venture

Around October 1994, the Mississippi defendants entered into a "Joint Venture Agreement" with several law firms to pursue litigation on behalf of the State of Mississippi against the tobacco companies. The Mississippi joint venture agreement contains the following relevant provisions:

1. *Purpose of Venture.* The objective or purpose for which the Venture is created is to perform the obligation of the Venture created by that certain *Memorandum of Understanding* entered into between certain of the members and the State of Mississippi to pursue litigation against particular members of the tobacco industry on behalf of the State of Mississippi, a copy of which is attached hereto, or any other similar agreement in the manner prescribed by and in accordance with the terms of this Joint Venture Agreement. The Venture will not engage in any business or devote itself to any objective other than that specified, unless it arises out of or is reasonably incidental thereto.

2. *Venture Name.* The name of the Joint Venture is HEALTH ADVOCATES LITIGATION TEAM JOINT VENTURE and is hereinafter referred to as the "Venture" or "H.A.L.T. Venture" and all assets, agreements and transactions shall be taken, executed and performed in the name of the Venture.

. . . . .

5. *Limits of Venture.* Each Member of the Venture shall be free to engage in any other business activity for the Member's exclusive benefit except as such activity shall be in conflict with the terms and purpose of this Agreement. The relationship between the Members shall be limited to performance of the purpose of the Venture in accordance with the terms of this Agreement. This Agreement shall be construed and deemed to create a Joint Venture limited solely to carrying out its purpose. Except as to the relationship created hereby, nothing herein shall be construed to create a general partnership between the Members or to authorize any Attorney to act as general agent for the other Member or to permit any Attorney to negotiate for or to take any other non-Venture related obligations,

duties, or liabilities for any other Member.

.　　.　　.　　.　　.

8. *Capital Contributions.* The Venture initially shall be funded by capital contributions from the Members in the total amount of $300,000.00 paid not later than October 15, 1994, in the following percentages:

| Member | Capital Contribution Share |
|---|---|
| a. Barrett/Clark/McTeer | 10% |
| b. Benton/McCormick/Rhoden | 15% |
| c. Lewis | 10% |
| d. Minor | 5% |
| e. [South Carolina defendants] | 22.5% |
| f. Oswald | 2.5% |
| g. Pittman | 10% |
| h. [Mississippi defendants] | 25% |

Future capital contributions shall be determined by a vote of the Members in accordance with the procedures described in paragraph 11 below. It is anticipated that not less than $300,000.00 will be required for each calendar year of Venture operations.

9. *Profits, Losses, Assets and Liabilities of the Venture.* For purposes of this agreement, the value of the services contributed by each Member of the Venture is deemed to be in proportion to that Member's distributive share of and interest in the income, expenses, profits, gain, loss, deduction, or credit of the Venture. Each Member's distributive share of and interest in the income, expenses, profits, gain, loss, deduction, or credit of the Venture shall be as follows:

| Member | Share/Interest |
|---|---|
| a. Barrett/Clark/McTeer | 10% |
| b. Benton/McCormick/Rhoden | 15% |
| c. Lewis | 10% |
| d. Minor | 5% |
| e. [South Carolina defendants] | 21.25% |
| f. Oswald | 5% |
| g. Pittman | 10% |
| h. [Mississippi defendants] | 23.75% |

Payments to Members of profits shall be made from the Venture bank account in the amount and at times as the Members may from time to time direct.

.　　.　　.　　.　　.

11. *Management.* This case is entirely under the direction and control of Attorney General Mike Moore. Overall management of the Venture is to be accomplished by vote of all of the Members, each Member (or licensed attorney designated by the Member) having a voice equal to that Member's capital interest share in the Venture as described in paragraph 8, above. The Members shall meet from time to time, as required, to act on matters pertaining to the Venture. All decisions, commitments, agreements, undertakings, understandings or other matters purporting to bind the Venture shall be mutually agreed upon by a majority of the Members' voting shares after consultation with all Members . . . .

Mr. Scruggs Dep. Ex. 1.

The South Carolina defendants were invited to sign the Mississippi joint venture agreement but they declined to do so, apparently for tax reasons. Nevertheless, they apparently abided by the joint venture agreement:

Dear Dickie [Scruggs]:

As we have discussed several times, we have not signed the Mississippi Joint Venture Agreement solely because we don't want to be governed by Mississippi Tax Law. We are agreeable to all terms in the agreement and, as you know, we have acted under the agreement from the beginning. If there is a problem with this please let me hear from you. As I am,

Sincerely,

Joseph F. Rice

*Id.* Ex. 2 (dated Feb. 12, 1997).

Mr. Scruggs and his Mississippi co-venturers "vehemently disagreed" with the letter written by Mr. Rice above. Mr. Scruggs Dep. at 22. Although the South Carolina defendants *worked with* the Mississippi co-venturers as one of the several law firms retained by the State of Mississippi, they never made any capital contributions as required by the Mississippi joint venture agreement. *Id.* at 15–16. "To the best of my knowledge, [the South Carolina defendants] never made a capital contribution to the Mississippi litigation pursuant to this agreement or any other agreement." *Id.* at 16. Instead, the Mississippi and South Carolina defendants paid expenses on their own; Mr. Scruggs estimates that his firm spent millions of dollars and the South Carolina defendants spent even more. *Id.* at 40. Over time, the fact that the South Carolina defendants were working on the Mississippi litigation but were not willing to sign the Mississippi joint venture agreement caused concern among the other co-venturers. *Id.* at 18–19, 21–22. Sometime around 1997, *id.* at 18, the Mississippi and South Carolina defendants apparently agreed between themselves to try to agree at a later date as to sharing the fees:

> We had an understanding—that is Ron Motley and I and Joe Rice of the [South Carolina defendants] had an understanding that at the end of the day, we would sit down and try to agree on a division of fees and expenses based on some sort of a quantum meruit basis because none of us could anticipate then what that might be. But it was only an agreement to try to agree. We ultimately did, in 1999, reduce it to an agreement, but we didn't have an agree-

ment other than to negotiate in good faith at that point.

*Id.* at 17–18.

### b. Collaboration in Other States

A list of the counsel for each state in the State Tobacco Litigation shows that the Mississippi defendants were counsel in approximately sixteen of the twenty-three states in which the South Carolina defendants were counsel. Mr. Scruggs Aff. Ex. B [Docket No. 13]; Barshak Aff. ¶ 10 [Docket No. 48]. By the time of the alleged agreement between Mr. Scruggs and Daynard in August 1996, "the bulk of the states" had already retained the defendants to represent the states against the tobacco companies. Mr. Scruggs Dep. at 34. Discovery produced a few of these agreements, which only show that both defendants signed the same agreement at the same time. *See id.* Exs. 8 (Michigan), 9 (Montana), 10–11 (Oklahoma). In the Oklahoma agreement, Mr. Scruggs signed on behalf of Mr. Motley, "after consulting him and getting his approval, of course." *Id.* at 51. "I would say that Ron Motley trusts me and I trust him . . . ." *Id.* at 52.

The defendants apparently held themselves out as a group of gentlemen who had agreed to work together on the various tobacco cases without any written agreement. An example is a letter dated March 13, 1998 from Joseph Rice of the South Carolina defendants to the Attorney General of Hawaii:

> Dear Attorney General Bronster:
>
> Ness, Motley has an agreement with Richard Scruggs to work jointly on all of the state cases against the Tobacco Industry. We have no formal, written agreement. Ness, Motley and Dick Scruggs have been doing business together for almost ten years and have never had any differences. We fully anticipate sitting down in hindsight and

determining what the division of any recoveries would be between the two law firms. There are no written documents I can send you.

I am sending a copy of this letter to Dick so he may respond likewise, if he has any questions or any additions.

I hope this satisfies your question. If you think something in writing is necessary, we will be glad to provide it. As I am,

Sincerely,

Joseph F. Rice

*Id.* Ex. 3. Mr. Scruggs characterizes this letter as a "bit of an overstatement." *Id.* at 38. "We were working jointly with [many different] people . . . . We were all working jointly against the tobacco industry, but to the same degree almost that we were with [the South Carolina defendants]." *Id.*

Jurisdictional discovery produced a few other hints that the defendants were treated as a single economic unit, at least for purposes of dividing fees. In correspondence concerning fees from the Florida litigation, the defendants were treated as a single economic unit. *Id.* Exs. 5–6; *see also id.* at 45–47. In correspondence from lawyers in Seattle, the defendants were treated as a single unit for purposes of sharing fees. *See id.* Ex. 7. In agreements with lawyers in Texas, the defendants were referred to collectively as "Ness Motley/Scruggs"; pursuant to that agreement, the Texas attorneys sent a large check made out to "Ness Motley/Scruggs." *Id.* Exs. 13–15.

Mr. Scruggs described his relationship with the South Carolina defendants as follows:

They were representing a number of states that we were not involved in. We were representing states they weren't involved in. There was a general cooperative effort between our firms to advance litigation against the tobacco industry . . . .

It was a cooperative and graduate sort of relationship where we were all trying to help each other as trial lawyers routinely do around the country when they're concentrating on litigation against a giant corporation.

. . . . .

My understanding with [the South Carolina defendants] was always that at the end of the day, we would attempt to negotiate a fee and expense sharing arrangement, each trusting the goodwill of the other to reach a successful negotiation, but without any guarantee that we would. It was always a concern of mine and his that if we were not able to make an agreement that we didn't want an ugly fight over fees, as what has erupted in this case and in other cases.

I think it's unseemly when lawyers sue each other, and I was concerned, as were they, that we might not be able to reach an agreement that would result in a lawsuit. Luckily, in 1999, we did reach such an agreement.

*Id.* at 19–20, 28–29.

### c. Contacts with Daynard

Mr. Scruggs stated in his deposition that he never directed either the Mississippi joint venture or the South Carolina defendants to work with Daynard in Massachusetts. In general, Mr. Scruggs stated that he knew who Daynard was, and might have communicated with him on a few occasions, but he never concerned himself with Daynard, either directly or indirectly:

● He was not aware of Daynard's involvement in the drafting of the Mississippi complaint. *Id.* at 13, 63–64.

● He was not aware of Daynard's efforts to promote his firm. *Id.* at 31, 32, 67.

• The only time he met Daynard in Massachusetts was to give a presentation at a seminar Daynard had organized in late 1995. "There were lots of speakers, and I was one." *Id.* at 53.

• He met with Laurence Tribe once at the Harvard Law School, at Professor Tribe's request, but the meeting was not related to Daynard. *Id.* at 55–56.

• The South Carolina defendants did not have authority to make decisions on behalf of the Mississippi joint venture, nor vice vera. *Id.* at 57.

• The South Carolina defendants did not have mutual control with the Mississippi defendants over all cases associated with the multistate tobacco litigation. *Id.* at 60.

• The South Carolina defendants had no ability to direct or control the Mississippi defendants in states which had not retained both defendants. *Id.* at 60.

• He neither requested nor directed the South Carolina defendants to contact or retain Daynard in Massachusetts. *Id.* at 58–59, 63–64, 67.

• He neither requested nor directed the Mississippi joint venture to contact Daynard in Massachusetts. *Id.* at 59.

• The Mississippi joint venture never directed the South Carolina defendants to contact Daynard in Massachusetts. *Id.* at 60.

The most significant contact between Daynard and Mr. Scruggs occurred in 1997 just before the Mississippi litigation went to trial:

> Daynard asked if I wanted him—more or less, it was put like, Don't you want me to be there to assist you in the trial as a consultant, not as a participant in the actual trial, but as a consultant.

And I said, Well, sure, Dick. If you can make it, that'd be great. We need all the help we could get. If you can come, fine. And then he asked me if I could—he said he was going to have to hire a substitute teacher if he were going to be down there during that part of the summer and would we compensate him for what he would have to pay for that substitute teacher at his law school and we agreed to do that.

*Id.* at 66.

### 2. Discussion

The critical issue before the Court is whether it may assert personal jurisdiction over the Mississippi defendants on the basis of the South Carolina defendants' contacts with Massachusetts. Daynard says the Court may do so because the defendants were in a joint venture. *See, e.g., Hill v. Shell Oil Co.,* 149 F.Supp.2d 416, 418 (N.D.Ill.2001) ("minimum contacts of one co-venturer are attributable to other co-venturers"). Daynard's argument raises three questions: First, whether the defendants had an agreement between themselves; second, whether that agreement properly can be characterized as a "joint venture"; and third, whether the agreement can serve as the basis for attributing the minimum contacts of one defendant to the other. The third question is most important.

### a. Definition of Joint Venture

The parties do not specify what law should be used to determine whether the defendants were in a joint venture, but the Mississippi defendants assume that Mississippi law should apply, as specified in the joint venture agreement itself, Mr. Scruggs Dep. Ex. 1, at 17. That assumption seems fair.[2]

---

**2.** Regardless, the choice of law is irrelevant, according to Daynard, because "[t]he defini-

tion is the same in Massachusetts," Pl.'s Opp'n at 3 n. 1 [Docket No. 15].

"There is no difference between a partnership and a joint venture except the latter has limited and circumscribed boundaries." *Hults v. Tillman*, 480 So.2d 1134, 1141 (Miss.1985). Mississippi has no particular test for identifying joint ventures, but this much can be said: First, a joint venture must have been *intended* by the co-venturers. Second, it must be for their mutual benefit with an understanding that they are to share in profits or losses and each is to have a voice in its management. In other words, a condition precedent for its existence is a joint proprietary interest in the enterprise and right of mutual control. *Pittman v. Weber Energy Corp.*, 790 So.2d 823, 826–27 (Miss.2001).

In the case at bar, there is direct evidence of a single joint venture agreement in Mississippi; there is no direct evidence of joint ventures to pursue litigation in other states or across the nation as a whole. The South Carolina defendants refused to sign the Mississippi joint venture agreement, however, because of the tax consequences, and they also refused to contribute money to its operations. Nevertheless, they apparently abided by its provisions and acted as if they were part of the Mississippi joint venture. Even so, paragraphs five and eleven of the Mississippi agreement make clear that the co-venturers were *not* general agents for each other and did *not* have the power to bind each other without the explicit authorization of the joint venture. Thus, the unilateral actions of the South Carolina defendants could not bind the Mississippi defendants. Indeed, paragraph two of the joint venture agreement required all joint-venture transactions to be performed in the name of the venture, "Health Advocates Litigation Team." In short, the defendants likely were not in a joint venture, as defined by Mississippi law, but even if they were, the co-venturers had very little power to bind each other unilaterally.

### b. Personal Jurisdiction Over Collaborators

Whether the defendants were in a joint venture is not dispositive; as stated before, the ultimate question is whether the Mississippi defendants lie within the reach of the Massachusetts long-arm statute as cabined by the Due Process Clause of the Fourteenth Amendment. Accordingly, the Court must start with the words of the statute:

> A court may exercise personal jurisdiction over a person, who acts directly *or by an agent*, as to a cause of action in law or equity *arising from* the person's
>
> (a) *transacting any business in this commonwealth* [.]

Mass. Gen. Laws ch. 223A, § 3 (emphasis added). The statute recognizes that an out-of-forum defendant may be bound by the inforum contacts of his "agent." *See, e.g., 163 Pleasant St. II*, 987 F.2d at 45. In this respect, Daynard finds support for his attempt to attribute the contacts of the South Carolina defendants to the Mississippi defendants. The question, then, is whether the South Carolina defendants acted as the "agent" of the Mississippi defendants. If the Court were to give the word "agent" its plain meaning, Daynard would lose. As discussed above, the defendants were not in any sort of agency relationship, but rather were in (at best) a dysfunctional joint venture that provided the co-venturers little, if any, mutual control. In Daynard's defense, however, the word "agent" presumably should be interpreted to the limits allowed by the Constitution, *see supra* p. 64, so again the Court will spare Daynard from a strict reading of the statute and instead will proceed to examine the outer bounds of Due Process.

In *Donatelli v. National Hockey League*, 893 F.2d 459 (1st Cir.1990), the First Circuit considered a fact pattern similar to the case at bar: A disgruntled professional hockey player tried to sue the National Hockey League ("NHL") in Rhode Island. The plaintiff argued that the NHL was subject to personal jurisdiction in Rhode Island because the minimum contacts of one of its teams, the Boston Bruins, could be attributed to the NHL. The NHL resisted this theory of attribution, arguing that it was merely part of an "unincorporated association" in which each team operated independently from the others and the NHL itself operated independently from the teams. A federal judge in Rhode Island asserted personal jurisdiction over the NHL. The First Circuit reversed.

*Donatelli*, like any case, can be distinguished in various ways, but none of the distinctions is material. First, the opinion concerned an "unincorporated association" rather than a collaboration of law firms. The opinion's analysis, however, goes well beyond the facts of the case and provides a versatile framework by which to judge all attempts to attribute the minimum contacts of one entity to another. Second, the opinion couched its discussion in terms of general jurisdiction rather than specific jurisdiction. The key question before the court, however, was not whether the defendant's contacts were "persistent" or "substantial"—the usual inquiry in cases of general jurisdiction, *see supra* p. 63—but rather whether the contacts of one entity could be attributed to another—the same question presented in this case by the statute's use of the word "agent." Mindful of these distinctions, but also appreciative of its teachings, the Court turns to *Donatelli* for guidance.

The court in *Donatelli* began by contrasting personal jurisdiction over a parent corporation through a subsidiary from personal jurisdiction over a partnership through a partner. With respect to the former, "[i]n general, the courts have presumed the institutional independence of parent and subsidiary when determining whether jurisdiction may be asserted over the parent solely on the basis of the subsidiary's contacts with the forum." 893 F.2d at 465. With respect to the latter, "[t]he general rule is that jurisdiction over a partner confers jurisdiction over the partnership." *Id.* at 466. After examining the relationship between the NHL and its teams, the First Circuit concluded that it was neither like a corporation nor like a partnership. Accordingly, the First Circuit created a jurisdictional test suitable for all entities between the extremes of separate incorporation, on the one hand, and partnership, on the other:

> It seems clear that a court must first make a factual determination concerning the extent to which the unincorporated association itself does business in, or has minimum contacts with, the forum. Where, as here, those contacts fall short of the constitutionally required minimum necessary to confer jurisdiction, the court must then ascertain whether one or more members of the association possess the requisite minimum contacts. If the answer is in the negative, the search for general jurisdiction ends. If, however, such contacts exist, the court must proceed to assess the extent of control, if any, exercised by the association over its members (and in particular, over the member whose contacts the plaintiff wishes to attribute to the association). As a subset of this inquiry, the court should assay the extent to which the member acts for, is an agent of, or is synonymous with, the association. The barometer for control, we think, is whether or not the association exercised substantial influence over the member's decision to carry on the in-forum activi-

ties which constitute the relevant "minimum contacts."

Our emphasis on control stems from a belief that the test for attribution should be a practical one. Absent a showing that the association had substantial influence over the member's decision to conduct activities in the forum, then it seems unfair to consider attributing the member's activities to the association; the "constitutional touchstone" of personal jurisdiction, after all, is whether the defendant "purposefully established 'minimum contacts' in the forum State." Unless such a showing can be made, ascribing the member's contacts to the association would be tantamount to haling the association into the forum solely as a result of attenuated third-party contacts or activities for which the association was not responsible. Personal jurisdiction cannot be hung on so fragile a hook. Because constitutional limitations upon a state's power to assert personal jurisdiction ultimately hinge upon concepts of accountability and responsibility, it would be irrational to allow courts to assert jurisdiction over an unaccountable party for the purpose of determining whether the party is indeed accountable.

The methodology has one last step. If the plaintiff cannot show that the association substantially influenced the decisionmaking leading to the member's in-forum activities, there can be no attribution. If, however, it can be demonstrated that the association had substantial influence over such decisionmaking, the court must determine whether, given the attribution and the "minimum contacts" which travel with it, the secondary criteria (*e.g.*, notice, predictability, foreseeability, purposeful availment, reciprocity, and the other Gestalt factors) render it equitable, or inequitable, to bring the unincorporated association before the forum court.

*Id.* at 468–69 (footnotes and citations omitted).

*Donatelli* emphasizes that "[t]he barometer for control ... is whether or not the association exercised substantial influence over the member's decision to carry on the in-forum activities which constitute the relevant 'minimum contacts.'" *Id.* at 469. In the context of the case at bar, the inquiry is whether the Mississippi defendants (i) had any control over the South Carolina defendants' contacts with Massachusetts or (ii) had agreed to be bound by the South Carolina defendants' actions. Neither was the case. Both the language of the Mississippi joint venture agreement and the realities of the relationship between the defendants fail to meet the "substantial influence" test of *Donatelli*. The defendants worked with the common goal of making money, but they did not exercise "substantial influence" over each other in pursuit of that goal, either in the Mississippi litigation or in the other cases across the country in which they collaborated.

In sum, Daynard cannot make a prima facie showing of personal jurisdiction over the Mississippi defendants, either directly or by attribution. If only direct contacts are considered, the Mississippi defendants did not transact any business in Massachusetts as required by the long-arm statute, or if they did, there was no purposeful availment as required by Due Process. If attribution is considered, the South Carolina defendants were not the "agent" of the Mississippi defendants, or if they were, there was no substantial influence as required by Due Process. Either way, the Court cannot assert personal jurisdiction over the Mississippi defendants.

## III. SOUTH CAROLINA DEFENDANTS

The Court dismissed the Mississippi defendants at the hearing held on September

13, 2001, and soon after entered partial judgment in their favor, Fed.R.Civ.P. 54(b), so that Daynard immediately could appeal the Court's ruling. With the Mississippi defendants out of the picture, the South Carolina defendants soon moved (i) to dismiss the case in its entirety for failure to join an indispensable party, Fed.R.Civ.P. 12(b)(7), or, in the alternative, (ii) to transfer the case to Mississippi, 28 U.S.C. § 1404(a), where a court would have personal jurisdiction over both defendants. The Court heard the South Carolina defendants' motion on November 14, 2001.

### A. Failure to Join an Indispensable Party

The South Carolina defendants argue that the case should not proceed without the Mississippi defendants because it was *Mr. Scruggs* who allegedly shook hands with Daynard in Chicago, so any lawsuit without Mr. Scruggs would be incomplete and only spawn subsequent lawsuits that *do* include Mr. Scruggs. Daynard, in response, argues that the handshake in Chicago was merely the culmination of many assurances from *both* the South Carolina defendants and the Mississippi defendants that he would receive attorneys' fees. Daynard Aff. ¶ 4 [Docket No. 33]; Compl. ¶¶ 53–57. In other words, Daynard argues that the defendants *together* agreed to pay him 5% of their attorneys' fees from the State Tobacco Litigation, so under a theory of joint and several liability, only one defendant need be named in the complaint.

### 1. Procedural Posture

A defense of failure to join an indispensable party, Fed.R.Civ.P. 12(b)(7), may be made at any time before the end of trial. Fed.R.Civ.P. 12(h)(2). The defense turns on Rule 19, which implicitly distinguishes "necessary" parties from "indispensable"

parties. A "necessary" party under Rule 19(a) is one that *should* be joined to effect a just adjudication, while an "indispensable" party under Rule 19(b) is simply a "necessary" party under Rule 19(a) who, for one reason or another, cannot be made a party *and* without whom the court determines the action cannot proceed. The important point to note is that "indispensable" is a subset of "necessary," not a mutually exclusive category.

Thus, determination of whether a party is "indispensable" requires two steps: First, is the party "necessary" under Rule 19(a)? Second, if the party is "necessary," is it also "indispensable" under Rule 19(b)? *E.g., United States v. San Juan Bay Marina*, 239 F.3d 400, 405 (1st Cir.2001). The First Circuit will review this Court's determination under Rule 19(b) for an abuse of discretion, *id.* at 403, but the First Circuit has not announced a standard of review for Rule 19(a), *id.* The First Circuit's reluctance to take a stand is understandable given the utter confusion among the circuits on the issue. *See Nat'l Union Fire Ins. Co. v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 250 n. 7 (4th Cir.2000) (noting confusion). If it mattered, the First Circuit has hinted that it "would be inclined to apply an abuse of discretion standard to such application-of-law decisions under Rule 19(a)." *Tell v. Trs. of Dartmouth Coll.*, 145 F.3d 417, 418–19 (1st Cir.1998).

As the moving party, the South Carolina defendants bear the burden of showing why the Mississippi defendants are indispensable and dismissal is proper under Rule 12(b)(7). *Lenon v. St. Paul Mercury Ins. Co.*, 136 F.3d 1365, 1372 (10th Cir.1998); *Raytheon Co. v. Continental Cas. Co.*, 123 F.Supp.2d 22, 32 (D.Mass.2000) (Saris, J.). "In meeting its burden, the moving party may present, and the court may consider, evidence out-

side of the pleadings." *Id.* at 32; 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1359, at 426–27 (2d ed.1990); *cf.* Fed.R.Civ.P. 19 advisory committee's note (1966 amendment) (noting decision may "properly be deferred if adequate information is not available at the time").

### 2. Discussion
#### a. Rule 19(a)—"Necessary"?

A party is "necessary"

if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a).

#### (1) Some Rules of Thumb

Over the years, several rules of thumb have developed under Rule 19:

- Joint tortfeasors are not necessary parties. Thus, by definition, they may not be indispensable.

- Co-obligors [to a contract] may be necessary parties, but generally are not indispensable.

- As a general rule, an action to set aside a contract requires the joinder of all parties to the contract.

4 *Moore's Federal Practice* § 19.06[1] (3d ed.2001) (citations and footnotes omitted). These rules of thumb correspond to the holdings in three Supreme Court cases: *Temple v. Synthes Corp.*, 498 U.S. 5, 7, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990) (per curiam), *Camp v. Gress,* 250 U.S. 308, 317, 39 S.Ct. 478, 63 L.Ed. 997 (1919), and *Shields v. Barrow,* 58 U.S. 130, 17 How. 130, 140, 15 L.Ed. 158 (1854). For the cognate Massachusetts rule, *see* Mass. R. Civ. P. 19(a), Reporters Notes—1973; *Thomas v. Benson,* 264 Mass. 555, 556–57, 163 N.E. 181 (1928) (in contract action, joint obligees are indispensable; joint obligors are only conditionally necessary); William G. Young, *Civil Procedure in the Courts of the Commonwealth of Massachusetts* C.P.–23 to –26 (Mass. Continuing Legal Educ.1978) (same).

The South Carolina defendants cite several decisions for the proposition that, generally speaking, all parties to a contract must be joined.[3] Defs.' Mem. at 4 [Docket No. 66]. The South Carolina defendants apparently advocate a rule of thumb in contravention to the rules of thumb recognized by the Supreme Court and the commentators, but regardless, "the proper approach today is to examine each case in light of the factors mentioned in Rules 19(a) and 19(b)." 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1613, at 176 (3d ed.2001).

The most lucid opinion applying Rule 19 to a contract action is *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,* 11 F.3d 399 (3d Cir.1993), *rev'g* No. 92–1581, 1993 WL 4165 (E.D.Pa. Jan. 5, 1993). The court carefully considered each of the fac-

---

**3.** *E.g., Rivera Rojas v. Loewen Group Int'l, Inc.,* 178 F.R.D. 356, 362 (D.P.R.1998) ("A contracting party is the paradigmatic example of an indispensable party."); *Rashid v. Kite,* 957 F.Supp. 70, 74 (E.D.Pa.1997) ("Generally, in breach of contract actions, all parties to the contract should be joined."); *Travelers Indem. Co. v. Household Int'l, Inc.,* 775 F.Supp. 518, 527 (D.Conn.1991) ("[P]recedent supports the proposition that a contracting party is the paradigm of an indispensable party.").

tors listed in Rule 19(a) and held that the absent defendant—a co-obligor to the alleged contract and the parent corporation of the named defendant—was not even "necessary," much less "indispensable." *Janney* considered, and partially rejected, arguments based on a line of cases from the First Circuit. Those cases are *Pujol v. Shearson/American Express, Inc.*, 877 F.2d 132 (1st Cir.1989); *H.D. Corp. v. Ford Motor Co.*, 791 F.2d 987 (1st Cir. 1986); and *Acton Co. v. Bachman Foods, Inc.*, 668 F.2d 76 (1st Cir.1982). Before turning to *Janney* and the parties' arguments, the Court will examine *Acton, H.D. Corp.*, and *Pujol.*

### (2) First Circuit Caselaw

In *Acton*, the First Circuit affirmed the dismissal of a contract action for failure to join an indispensable party. The facts are as follows: A parent corporation and its subsidiary agreed to purchase the assets of another company. When the deal fell through, two lawsuits arose: (i) the seller sued both the parent and the sub in New York state court for breach of contract, and (ii) the sub—without joining the parent—sued the seller in the District of Massachusetts seeking a declaration that the contract was void as a result of the seller's misrepresentations. The district court dismissed the sub's lawsuit for failure to join the parent. The First Circuit affirmed:

> There is little doubt that [the parent], as a party to the letter of intent and to the purchase agreement, should be joined to this action if feasible.... To begin, [the parent] played a substantial role in negotiating both agreements; indeed, [the sub] did not even exist in April 1979 when the letter of intent was signed. Thus [the parent] may have rights under this preliminary agreement not shared by [the sub]. Moreover, according to the express terms of the purchase agreement, [the parent] and not

> [the sub] would be entitled to refund of the $250,000 deposit. Unless [the parent] were bound by the results of [the sub's] suit, it would remain free to commence a new action on its claims. [The parent's] presence is therefore desirable not only to avoid piecemeal and duplicative litigation, but also to provide complete relief to the [seller]. *See* Rule 19(a)(1).
>
> In addition, [the parent], as [the sub's] parent corporation and as [the sub's] guarantor, might be bound by [the sub's] suit under the doctrine that res judicata applies not only to the actual parties but also to those in privity with the parties. If so, to proceed in [the parent's] absence might impair [the parent's] interest in the controversy very significantly. Even if [the parent] would not be legally bound, an adverse ruling would be a persuasive precedent in a subsequent proceeding, and would weaken [the parent's] bargaining position for settlement purposes. In either case, to proceed without [the parent] might "as a practical matter impair or impede" [the parent's] ability to protect its interest in this matter. Rule 19(a)(2)(i). [The parent] is therefore a ["necessary" party].

668 F.2d at 78–79 (citations omitted). The facts of *Acton* are distinguishable from the case at bar in two notable respects: (i) the absent party in *Acton* was a co-oblig*ee*, not a co-oblig*or*, and (ii) any judgment in *Acton* likely would have been binding against the absent defendant because it was in privity with the co-obligee.

In *H.D. Corp.*, several automobile dealerships brought a breach of contract action in the District of Puerto Rico against Ford Motor Company and its local subsidiary. The dealerships and Ford were all Delaware corporations, so the district court dismissed Ford from the action to preserve diversity, leaving only its local sub-

sidiary as a defendant. The district court went on to dismiss the action entirely, however, because it concluded that Ford was an indispensable party. The First Circuit affirmed. The holding of *H.D. Corp.* is not instructive, though, for two reasons. First, the court held that Ford was "indispensable" without considering whether it was "necessary." 791 F.2d at 992–93. Second, given the case-specific inquiry required by Rule 19(b), an opinion affirming a finding that a party is "indispensable" does not provide useful guidance far beyond its particular facts.

Finally, in *Pujol*, the First Circuit noted with approval the distinction traditionally drawn between joint tortfeasors and persons jointly liable on a contract:

> [I]f one thing is clear in respect to Rule 19, it is that, unlike a person vicariously liable in tort, a person potentially liable as a joint tortfeasor is *not* a necessary or indispensable party, but merely a permissive party subject to joinder under Rule 20. . . .
>
> Of course, one might wonder why Rule 19 would treat "joint tortfeasors" differently in this respect than, say, persons jointly liable under a contract. *See Acton*, 668 F.2d at 81–82 ("an action seeking rescission of a contract must be dismissed unless all parties to the contract, and others having a substantial interest in it, can be joined"); *see also H.D. Corp.*, 791 F.2d at 993. The reason for the difference may lie in the history of joinder doctrine, or it may reflect a compromise between the interests served by Rule 19 and the policies of tort law. But, regardless of the reasons, this case presents no basis for ignoring such well established precedent [concerning jointly and severally liable tortfeasors].

877 F.2d at 137 (citations omitted). The quotation above, however, is dictum and adds nothing to the holdings of *Acton* and *H.D. Corp.*

### (3) *Janney*

In *Janney*, an investment bank agreed to be the exclusive advisor to a parent corporation and its subsidiaries. Later, the investment bank sued one of the subs—but not the parent—for failing to pay the fees contemplated by the agreement. Both the parent and the sub were co-obligors, but only the parent had signed the contract. The Third Circuit carefully analyzed each provision of Rule 19(a) and concluded that the parent was not a "necessary" party:

*Rule 19(a)(1)* —"in the person's absence complete relief cannot be accorded among those already parties." The court held that this factor did not apply because the defendants could be jointly and severally liable under the contract. 11 F.3d at 405–06. The court noted that it was possible that the contract, in fact, did not impose joint and several liability on the defendants, but the court held that all inferences had to be drawn in the plaintiff's favor on a motion to dismiss, so the court assumed joint and several liability. *Id.* at 406.

*Rule 19(a)(2)(i)* —"the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may as a practical matter impair or impede the person's ability to protect that interest." The court held that this factor did not apply because any judgment against the defendants would not *bind* the absent defendant. 11 F.3d at 406–11. The court also rejected the argument that any such judgment would nevertheless act as "persuasive precedent" and thus impair the absent defendant's ability to protect its interests:

We are not sure what the district court means by the phrase "persuasive precedent." To the extent it involves the doctrine of *stare decisis*, we are not inclined to hold that any potential effect the doctrine may have on an absent party's rights makes the absent party's joinder compulsory under Rule 19(a) whenever "feasible." Such a holding would greatly expand the class of "necessary" or compulsory parties Rule 19(a) creates. Moreover, to whatever extent the rule's phrase "as a practical matter impair or impede" has broader meaning than that given by principles of issue preclusion, we think the effect of the federal decision must be more direct and immediate than the effect a judgment in [the defendant's] favor would have on [the absent defendant] here. They are, after all, separate corporate entities. In any event, we do not believe any possibility of a "persuasive precedent" requires joinder under subsection 19(a)(2)(i).

. . . [The defendant] cites [*Acton Co. v. Bachman Foods, Inc.,* 668 F.2d 76 (1st Cir.1982) ] to support its argument that the potentially persuasive effect of the federal action on any related litigation justifies the district court's conclusion that the absent party's joinder is compulsory under Rule 19(a)(2)(i). That argument ignores the United States Court of Appeals for the First Circuit's refusal to adopt a persuasive precedent standard for a Rule 19(a) determination that all tortfeasors who could be jointly and severally liable should be joined if feasible. *See Pujol v. Shearson/American Express, Inc.,* 877 F.2d 132, 136 (1st Cir.1989) ("The mere fact, however, that Party A, in a suit against Party B, intends to introduce evidence that will indicate that a non-party, C, behaved im-

properly does not, by itself, make C a necessary party."). Though we recognize that the *Pujol* court distinguished joint tortfeasors from joint obligors and stated that *Acton* was still good law as applied to contract liability, *id.* at 137, we see no logical distinction that would justify treating contract actions differently than tort actions for purposes of compulsory joinder. Instead, we believe the distinction made by the Court of Appeals for the First Circuit is based on authority, not logic. Thus, to the extent *Pujol* goes beyond a panel's recognition of the need to accept controlling circuit precedent, it does not persuade us. For the reasons already stated, we hold instead that [the absent defendant], a co-obligor, is not a party whose joinder Rule 19(a)(2)(i) requires because continuation of the federal litigation in [a co-obligor's] absence will not create a precedent that might persuade another court to rule against [the co-obligor] on principles of *stare decisis,* or some other unidentified basis not encompassed by the rules of collateral estoppel or issue preclusion.

We do not ignore the *Acton* court's suggestion that joinder of an absent party is compulsory under Rule 19(a)(2)(i) if the federal litigation would have a preclusive effect against the absent party in subsequent state litigation. *Acton,* 668 F.2d at 78. Indeed, we agree. If issue preclusion or collateral estoppel could be invoked against [the absent defendant] in other litigation, continuation of the federal action could "as a practical matter impair or impede" [the absent defendant's] interests and so Rule 19(a)(2)(i) would require its joinder if joinder were feasible. Fed.R.Civ.P. 19(a)(2)(i). In the case before us, however, this argument lacks force. Mere presentation of an argument that issue preclusion is possible is not enough to trigger Rule

19(a)(2)(i). Rather, it must be shown that some outcome of the federal case that is reasonably likely can preclude the absent party with respect to an issue material to the absent party's rights or duties under standard principles governing the effect of prior judgments. If impairment of the absent party's interest is not shown in that sense, the adequacy of [the defendant's] representation of [the absent defendant's] interest is not material. [The defendant's] assumption that any potential for issue preclusion compels a holding that a party is necessary under Rule 19(a)(2)(i) cannot be accepted.

*Id.* at 407, 408–09 (citations and footnotes omitted).

██ *Rule 19(a)(2)(ii)*—"the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." The court held that this factor did not apply because the risk of inconsistent *adjudications* is not the same thing as inconsistent *obligations*.[4] 11 F.3d at 411–13.

4. The First Circuit recently reiterated this distinction:
 "Inconsistent obligations" are not, however, the same as inconsistent adjudications or results. Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident. Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum. Unlike a risk of inconsistent obligations, a risk that a defendant who has successfully defended against a party may be found liable to another

The possibility that [the defendant] may bear the whole loss if it is found liable [and the absent defendant later is found *not* liable] is not the equivalent of double liability. It is instead a common result of joint and several liability and should not be equated with prejudice. Inherent in the concept of joint and several liability is the right of a plaintiff to satisfy its whole judgment by execution against any one of the multiple defendants who are liable to him, thereby forcing the debtor who has paid the whole debt to protect itself by an action for contribution against the other joint obligors.

*Id.* at 412.

Thus, the Court in *Janney* held that the absent co-obligor was not even a "necessary" party under Rule 19(a), let alone an "indispensable" party under Rule 19(b).

**(4) The Parties' Arguments**

██ First, pointing to subsection (a)(1), the South Carolina defendants argue that Daynard cannot get complete relief in this Court because he will not be able to recover the money owed by the Mississippi defendants. Defs.' Mem. at 6 n. 2. This argument assumes that Daynard entered into separate contracts with the South Carolina and Mississippi defendants, an assumption the Court cannot make on a

party in a subsequent action arising from the same incident—i.e., a risk of inconsistent adjudications or results—does not necessitate joinder of all of the parties into one action pursuant to Fed.R.Civ.P. 19(a). Moreover, where two suits arising from the same incident involve different causes of action, defendants are not faced with the potential for double liability because separate suits have different consequences and different measures of damages.
*Delgado v. Plaza Las Americas, Inc.*, 139 F.3d 1, 3 (1st Cir.1998) (per curiam) (citations omitted), *vacating* 173 F.R.D. 30 (D.P.R. 1997).

motion to dismiss. To the contrary, the South Carolina defendants bear the burden of persuasion, so the Court must draw inferences in Daynard's favor and assume that the defendants are jointly and severally liable.

■ Second, pointing to subsection (a)(2)(i), the South Carolina defendants argue that because they likely will pursue the "empty chair" defense—in particular, that Daynard made a contract *only* with Mr. Scruggs—a judgment in favor of the South Carolina defendants would be "persuasive precedent" against the Mississippi defendants, thus impairing the Mississippi defendants' ability to defend themselves as a practical matter. Defs.' Mem. at 5–6 & n. 1. As discussed above, *supra* pp. 82 – 83, both the First Circuit and *Janney* have rejected this very argument, and so must this Court.[5]

Third, pointing to subsection (a)(2)(ii), the South Carolina defendants argue that there is the possibility that they *alone* will end up footing the entire bill when, in fact, the Mississippi defendants are entirely or partly responsible. Defs.' Mem. at 6. As discussed above, *supra* pp. 82 – 83, both the First Circuit and *Janney* have rejected this very argument, and so must this Court.

Fourth, recognizing the traditional rule of thumb that co-obligees are "indispensable" parties while co-obligors might not even be "necessary," the South Carolina defendants try to cast themselves as co-obligees under the alleged contract. Defs.' Reply at 6 [Docket No. 76]. In other words, the South Carolina defendants argue that Daynard still owes legal research and advice to the defendants—even though the State Tobacco Litigation settled years ago. This argument is as silly as it is belated. The only question before the Court is whether the defendants owe Daynard money; there has never been any suggestion that Daynard still owes services to the defendants. The Court rejects the notion that the South Carolina defendants are co-obligees and instead recognizes them for what they really are—co-obligors.

Finally, recognizing the traditional rule of thumb that an action to set aside a contract requires the joinder of all parties to the contract, the South Carolina defendants argue that a mutual release to which Daynard allegedly agreed puts the validity and enforceability of the alleged contract into question and thus requires joinder of all parties to the alleged contract. Defs.' Reply at 5 (citing *Vedder Price Kaufman & Kammholz v. First Dynasty Mines, Ltd.*, No. 01–3970, 2001 WL 1190996 (S.D.N.Y. Oct. 9, 2001)). This argument twists the traditional rule of thumb, which is that an action *in equity* to determine the *rights* under a contract requires joinder of all the parties to the contract. The case at bar concerns only money damages (legal relief) and does not concern rescission or specific performance (equitable relief). Accordingly, the traditional rule of thumb that rescission requires joinder of all parties must give way to the traditional rule of thumb that a plaintiff need not name all co-obligors as defendants.

In short, the Court holds that it is not *necessary* for Daynard to join the Mississippi defendants in this action because they are (or, drawing inferences in Daynard's favor, could be) jointly and severally liable co-obligors.

---

**5.** Similarly, the Mississippi defendants cannot be "necessary" merely because the South Carolina defendants need to obtain evidence from them. *E.g., Johnson v. Smithsonian Inst.*, 189 F.3d 180, 188–89 (2d Cir.1999) (citing *Costello Publ'g Co. v. Rotelle*, 670 F.2d 1035, 1044–45 (D.C.Cir.1981)).

### b. Rule 19(b)—"Indispensable"?

■ If the Mississippi defendants are not "necessary" under Rule 19(a), then by definition they cannot be "indispensable" under Rule 19(b). Nevertheless, the Court will consider the South Carolina defendants' arguments under Rule 19(b) for the sake of completeness.

■ If a "necessary" party cannot be joined (*e.g.*, because of a lack of personal jurisdiction), "the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Fed.R.Civ.P. 19(b). The factors to be considered by the court include:

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

*Id.* The Supreme Court has identified four corresponding interests a court might want to consider:

> (1) the interest of the outsider whom it would have been desirable to join; (2) the defendant's interest in avoiding multiple litigation, inconsistent relief, or sole responsibility for a liability it shares with another; (3) the interest of the courts and the public in complete, consistent, and efficient settlement of controversies; and (4) the plaintiff's interest in having a forum.

*H.D. Corp.*, 791 F.2d at 992 (citing *Provident Tradesmens Bank & Trust Co. v.*

*Patterson*, 390 U.S. 102, 108–11, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968)).

■ As mentioned before, the First Circuit will review this Court's determination under Rule 19(b) for an abuse of discretion. Accordingly, precedent provides little guidance. "Whether a person is 'indispensable,' that is, whether a particular lawsuit must be dismissed in the absence of that person, can only be determined in the context of particular litigation." *Provident Tradesmens*, 390 U.S. at 118, 88 S.Ct. 733. With this in mind, the Court turns to the four factors enumerated in Rule 19(b), which substantially overlap with the factors enumerated in Rule 19(a).

*First, to what extent might a judgment rendered in the person's absence be prejudicial to the person or those already parties?* This factor tends to favor Daynard. The South Carolina defendants argue that (i) there is the possibility that they *alone* will end up footing the entire bill, which would prejudice them; (ii) there is the possibility that a successful "empty chair" defense would result in "persuasive precedent," which would prejudice the Mississippi defendants; and (iii) there is the possibility of an inconsistent adjudication in a later lawsuit, which could prejudice any of the parties. Defs.' Mem. at 9–10; Defs.' Reply at 6–8. The Court rejects these arguments for the same reasons given before, namely (i) joint and several liability by definition includes the possibility that one defendant ends up footing the entire bill, (ii) "persuasive precedent" alone cannot, as a practical matter, impair or impede the Mississippi defendants' ability to defend themselves, and (iii) Rule 19 is concerned with the risk of inconsistent *obligations*, not inconsistent *adjudications*. *See supra* pp. 82 – 83.

*Second, to what extent can the prejudice be lessened or avoided by protective provi-*

*sions in the judgment, by the shaping of relief, or other measures?* This factor does not seem relevant to this dispute. According to the advisory committee's note, "protective provisions" includes requiring a defendant to set aside money in case absent plaintiffs later obtain judgments, and the "shaping of relief" includes awarding money damages in lieu of specific performance where the latter might affect an absentee adversely.

*Third, would a judgment rendered in the person's absence be adequate?* This factor clearly favors Daynard. The South Carolina defendants are (or, drawing inferences in Daynard's favor, could be) jointly and severally liable. The South Carolina defendants complain that allowing Daynard to obtain complete relief from them will result in a second lawsuit between the defendants, Defs.' Mem. at 12, but that is their problem, not Daynard's. Obviously a single lawsuit would be more efficient than multiple lawsuits, but this factor only concerns whether the judgment would be adequate to Daynard.

*Fourth, would the plaintiff have an adequate remedy if the action is dismissed for nonjoinder?* This factor clearly favors the South Carolina defendants. Daynard could bring suit against all the defendants in Mississippi.

In sum, the first and third factors favor Daynard, the second factor is not relevant, and the fourth factor favors the South Carolina defendants. The question is not simply how many factors point in one direction, of course, but "whether in equity and good conscience the action should proceed among the parties before [the court], or should be dismissed, the absent person being thus regarded as indispensable." Fed.R.Civ.P. 19(b). To this question the Court answers that it would allow the ac-

tion to proceed against the South Carolina defendants even if the Mississippi defendants properly were regarded as "necessary" parties.

## B. Change of Venue

In the alternative, the South Carolina defendants ask the Court to transfer this case to the Southern District of Mississippi in Biloxi, where Daynard properly could have filed his complaint in the first place and where personal jurisdiction over the defendants would not be a problem.

### 1. Procedural Posture

A defense of *improper* venue, Fed. R.Civ.P. 12(b)(3); *see also* 28 U.S.C. § 1406(a), is waived if neither made by motion under Rule 12 nor included in a responsive pleading. Fed.R.Civ.P. 12(h)(1). A motion to *change* venue, 28 U.S.C. § 1404(a), on the other hand, need not be made at the first opportunity, although a party should not tarry in bringing such a motion. 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3844, at 334–37 & nn. 15–19 (2d ed.1986). The South Carolina defendants' have moved to *change* venue pursuant to section 1404(a).

### 2. 28 U.S.C. § 1404(a)

Section 1404(a) provides:

§ 1404. *Change of venue*

(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a).[6]

 Section 1404(a) displaces the common-law doctrine of forum non conveniens

---

**6.** Title 28 contains two other transfer provi-

sions: section 1406(a), which allows transfer

when the transfer is within the federal court system. "[A]lthough [section 1404(a)] was drafted in accordance with the doctrine of *forum non conveniens*, it was intended to be a revision rather than a codification [7] of the common law." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (citations omitted). "The harshest result of the application of the old doctrine of forum non conveniens, dismissal of the action, was eliminated by the provision in § 1404(a) for transfer.... As a consequence, we believe that Congress ... intended to permit courts to grant transfers upon a lesser showing of inconvenience.[8] This is not to say that the relevant factors [9] have changed or that the plaintiff's choice of forum is not to be considered, but only that the discretion to be exercised is broader." *Norwood v. Kirkpatrick*, 349 U.S. 29, 32, 75 S.Ct. 544, 99 L.Ed. 789 (1955).

There is a strong presumption in favor of the plaintiff's choice of forum, *e.g., Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir.2000), and the presumption is even stronger when the plaintiff resides in

---

when venue is "wrong," and section 1631, which allows transfer when "jurisdiction" is lacking. The circuits are hopelessly split on which of the three transfer provisions applies when the basis for transfer is a lack of personal jurisdiction, *see* 17 *Moore's Federal Practice* § 111.02[1][b][ii][B] (3d ed.2001); *see also Bearse v. Main St. Invs.*, 170 F.Supp.2d 107, 115–17 (D.Mass.2001) (Collings, Mag.) (holding that only section 1406 applies, given *Albion v. YMCA Camp Letts*, 171 F.3d 1, 2 (1st Cir.1999) (rejecting application of 1404(a)), and *Pedzewick v. Foe*, 963 F.Supp. 48, 50 (D.Mass.1997) (rejecting application of section 1631)), but the Court need not tackle this problem today because the South Carolina defendants, not the Mississippi defendants, filed the motion presently under consideration.

7. *Contra Albion v. YMCA Camp Letts*, 171 F.3d 1, 2 (1st Cir.1999) (citing *Pedzewick v. Foe*, 963 F.Supp. 48, 50 n. 1 (D.Mass.1997) (dictum)); *Pike v. Clinton Fishpacking, Inc.*, 143 F.Supp.2d 162, 171 (D.Mass.2001) (Lindsay, J.) (quoting *Albion*); *Veryfine Prods., Inc. v. Phlo Corp.*, 124 F.Supp.2d 16, 21 (D.Mass. 2000) (same); *GSI Lumonics, Inc. v. BioDiscovery, Inc.*, 112 F.Supp.2d 99, 104 (D.Mass. 2000) (same).

8. *But see, e.g., Pike v. Clinton Fishpacking, Inc.*, 143 F.Supp.2d 162, 171 & n. 3 (D.Mass. 2001) (Lindsay, J.) (conflating section 1404(a) and forum non conveniens); *Veryfine Prods., Inc. v. Phlo Corp.*, 124 F.Supp.2d 16, 21–22 (D.Mass.2000) (same); *GSI Lumonics, Inc. v. BioDiscovery, Inc.*, 112 F.Supp.2d 99, 104–05 (D.Mass.2000) (same).

9. Under the doctrine of forum non conveniens, a court may consider various "private interest factors" and various "public interest factors." Private interest factors that may be considered include the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; the possibility of a view of the premises, if a view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive. Public interest factors that may be considered include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Piper*, 454 U.S. at 241 n. 6, 102 S.Ct. 252 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). The "interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action" might not be an appropriate consideration anymore. *Compare Ferens v. John Deere Co.*, 494 U.S. 516, 529–30, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) (quoting all public interest factors with approval), *with Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (reversing court of appeals for deferring to district court's determination of state law).

the chosen forum, *Kleinerman v. Luxtron Corp.*, 107 F.Supp.2d 122, 125 (D.Mass. 2000) (Gorton, J.). The burden of proof rests with the party seeking transfer, and a district court's decision under section 1404(a) will be reviewed for an abuse of discretion. *Coady*, 223 F.3d at 11. A court may only transfer an action under section 1404(a) to a district in which the plaintiff properly could have filed his complaint in the first place. *Hoffman v. Blaski*, 363 U.S. 335, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960). If a court allows a motion to transfer under section 1404(a), the transferee court must apply the law of the transferor court, *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), even if it was the plaintiff who requested the transfer, *Ferens v. John Deere Co.*, 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990).

Section 1404(a) advises a court to consider "the convenience of parties and witnesses" (private interests) and "the interest of justice" (public interests). The statute does not specify any particular factors to consider, but the case law does. As already mentioned, the plaintiff's choice of forum is the most important factor to consider. Beyond that, different cases emphasize different factors as important to the transfer calculus. Some cases have stated that "trial efficiency" is a paramount concern. *JMTR Enters., LLC v. Duchin*, 42 F.Supp.2d 87, 99–100 (D.Mass.1999) (citing *Coady v. Ashcraft & Gerel*, 996 F.Supp. 95, 101 (D.Mass.1998), *rev'd*, 223 F.3d 1, 11 (1st Cir.2000)). Others have found the relative financial positions of the parties to be important. *Sigros v. Walt Disney World Co.*, 129 F.Supp.2d 56, 71 (D.Mass.2001) (Gorton, J.); *Kleinerman*, 107 F.Supp.2d at 125. Many have found the convenience of the witnesses to be most important. *E.g., Home Prods. Int'l–N. Am., Inc. v. PeopleSoft USA, Inc.*, 201 F.R.D. 42, 48 (D.Mass.2001) (Keeton, J.); *Princess House, Inc. v. Lindsey*, 136 F.R.D. 16, 18 (D.Mass.1991) (Bowler, Mag.). The list could go on.[10] In short, any number of private and public interests might inform the decision whether to change venue.

### 3. Discussion

■ Daynard challenges the motion to transfer head on; he does not challenge the timing of the motion or the proposed destination. Daynard simply argues that he is entitled to his choice of forum—especially given that he resides here—and that it would be extremely burdensome for someone of his limited means to litigate away from home—in contrast to the burden on the defendants, whom Daynard alleges to be extraordinarily rich.[11] Pl.'s

---

10. "While there is no definitive list of factors that must be considered, courts typically look to some or all of the following 'public' 'and private' interest factors to determine whether the proposed alternative forum would better serve the convenience and interest of justice requirements:" (i) the plaintiff's original choice of forum, (ii) where the events at issue in the lawsuit took place, (iii) the convenience of the parties, (iv) the convenience of the witnesses, (v) the comparative availability of compulsory process to compel the attendance of unwilling witnesses, (vi) the location of the physical evidence, (vii) the enforceability of the judgment, (viii) in which forum can the case be tried more inexpensively and expedi-

tiously, (ix) the relative court congestion in the two forums, (x) the public interest in local adjudication of local controversies, (xi) the relative familiarity of the courts with the applicable law, (xii) whether transfer is in the "interest of justice," (xiii) which forum would better serve judicial economy, and (xiv) whether a contractual clause specifies a specific forum to resolve contractual disputes. 17 *Moore's Federal Practice* § 111.13[1][b] (3d ed.2001).

11. Daynard also argues that venue is proper here in Boston, which nobody denies, given that he has many documents here and that some of the events in question took place

Opp'n at 7–8, 10 [Docket No. 74]. The South Carolina defendants disagree for several reasons.

First, the South Carolina defendants argue that transferring the case to Mississippi would allow a single court to resolve this entire dispute, whereas the present situation likely will result in subsequent litigation. Defs.' Mem. at 14–15, 18–19. This is the South Carolina defendants' strongest argument, as the "possibility of consolidation" is routinely identified as one reason for allowing a motion to transfer. *E.g., Coady,* 223 F.3d at 11. Daynard, in response, effectively argues, "Obviously I know a single lawsuit involving all the witnesses would be easier—that's why I've appealed the decision to dismiss the Mississippi defendants—but I am entitled to my chosen forum." Daynard's argument is at least as strong as the argument in favor of consolidation.

Second, the South Carolina defendants question Daynard's I'm-just-a-poor-professor refrain. Defs.' Reply at 10. Given that Daynard will have to travel all over the country to depose witnesses—regardless of where the trial is held—the South Carolina defendants figure that Daynard will have to spend a lot of money on discovery no matter what the venue. The South Carolina defendants likely have their math correct, but if the discovery expenses are a wash, that favors Daynard, not the South Carolina defendants: all else being equal, there is a strong presumption in favor of the plaintiff's choice of forum.

Third, the South Carolina defendants argue that most of the witnesses will be from the South anyway, so Mississippi would be more convenient than Massachusetts. Defs.' Mem. at 17–18. As noted above, most courts consider the convenience of the witnesses second only to the plaintiff's choice of forum in importance. The question, then, is whether traveling to Boston (a nice place to visit and an East Coast transportation hub) is really more of a hassle for witnesses than traveling to Biloxi, Mississippi (an equally nice place to visit to escape the often meaningless hustle of a city in the Northeast, but not much of a transportation mecca).[12] The simple answer is that the parties have not identified the likely witnesses or their residences. At the moment, the only potential witnesses that have been identified are Daynard (from Boston), Mr. Scruggs (from nearby Pascagoula), Wendell Gauthier (from New Orleans, Louisiana, which is ninety miles from Biloxi), and Messrs. Motley and Rice (from Charleston, South Carolina). In other words, so far either (i) four witnesses must fly to Boston or (ii) three witnesses must fly to Biloxi (Gauthier will no doubt drive over from New Orleans)—not much of a difference either way.[13] Accordingly, on the limited record before the Court, Boston would appear no more inconvenient than Biloxi for those witnesses who must travel.

Finally, the South Carolina defendants argue that if Mississippi law governs this dispute, a Mississippi court would have

here. Pl.'s Opp'n at 8–11. The documents Daynard has, though, relate to his academic research, not the contract at issue, and in a contract case it does not seem particularly important where the events took place, especially if they took place all over.

12. The United States District Court for the Southern District of Mississippi holds court in Biloxi, Hattiesburg, and Jackson, Mississippi. Mr. Scruggs lives in Pascagoula, Mississippi,

about twenty miles from Biloxi. The South Carolina defendants have specifically identified Biloxi as their preferred transferee venue.

13. Daynard also has suggested that he would call to the stand various attorneys general from across the country, Pl.'s Opp'n at 11, but for them no single forum would be most convenient.

more familiarity with the applicable law in this case. Defs.' Mem. at 19. There is reason to question whether this is still a proper factor to consider, *see supra* note 9, but in any event, the argument is premature because it is not clear if Mississippi law will, in fact, govern this dispute.

This discussion of relative trivia ought not obscure what is really going on here. This is a jury case. Daynard wants to try his case before a Massachusetts jury. The South Carolina defendants, allied with Mr. Scruggs, want to try the case before a Mississippi jury near Scruggs' home town. They know that all statistical studies show that if they can winkle Daynard out of his chosen forum, their chances of success escalate significantly. *See generally* Kevin M. Clermont & Theodore Eisenberg, *Exorcising the Evil of Forum–Shopping*, 80 Cornell L.Rev. 1507 (1995). Uneasy about conceding potential parochialism on the part of supposedly impartial juries, courts sweep the matter under the rug by emphasizing some supposed intrinsic value in the plaintiff's choice of forum. What we really mean, of course, is that in the absence of significant countervailing factors, the plaintiff ought get a crack at a jury in the venue of his choice.

In sum, Daynard has a strong argument that he is entitled to his choice of forum and the South Carolina defendants have a strong argument that it would be simpler to have a single trial in Mississippi. On the present record, the cost to the parties and witnesses is a wash and the other arguments are not persuasive. In light of these considerations, the Court will defer to Daynard's choice of forum at this time. Once trial approaches, however, the Court will be receptive to another motion to change venue, either by the South Carolina defendants, if they give *specific* and *concrete* reasons in support thereof, or by Daynard, if he concludes that he would prefer a trial that includes the Mississippi defendants.

## IV. CONCLUSION

For the reasons set forth above, the Mississippi defendants' motion to dismiss for lack of personal jurisdiction [Docket No. 10] was ALLOWED on September 13, 2001, and the South Carolina Defendants' motion to dismiss or change venue [Docket No. 64] was DENIED on November 15, 2001.